# EXHIBIT A



null / ALL
**Transmittal Number:** 29648042
**Date Processed:** 08/07/2024

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Legal Department null<br>RLI Corp.<br>9025 N Lindbergh Dr<br>Peoria, IL 61615-1499 |
| **Electronic copy provided to:** | Sandy Clayton<br>Jerri Taliferro<br>Brooklyn Taylor<br>Dena Durand<br>Jill Aeschleman<br>Scott Ostericher<br>Christina Dean<br>Jeffrey Fick<br>Jamie Davis<br>Margie Wagner<br>Jessica Harper |

| | |
|---|---|
| **Entity:** | RLI Insurance Company<br>Entity ID Number  4398638 |
| **Entity Served:** | Rli Insurance Company |
| **Title of Action:** | Klutch Sports Group, LLC vs. Rli Insurance Company |
| **Matter Name/ID:** | Klutch Sports Group, LLC vs. Rli Insurance Company (16090056) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Los Angeles County Superior Court, CA |
| **Case/Reference No:** | 651043/2022 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 08/07/2024 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Sender Information:** | Pasich LLP<br>424-313-7860 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
RLI INSURANCE COMPANY

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KLUTCH SPORTS GROUP, LLC

Electronically FILED by
Superior Court of California,
County of Los Angeles
7/26/2024 3:58 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Cervantes, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse

111 N. Hill Street, Los Angeles, CA 90012

| CASE NUMBER: *(Número del Caso):* |
|---|
| 24STCV18643 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
L. Noelle Malindzak, PASICH LLP, 1230 Rosecrans Avenue, Suite 690, Manhattan Beach, CA 90266, (424) 313-7860

DATE: July 26, 2024        Clerk, by David W. Slayton, Executive Officer/Clerk of Court , Deputy
*(Fecha)* 07/26/2024        *(Secretario)* _____ C. Cervantes *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* RLI INSURANCE COMPANY

   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Kirk Pasich (SBN 94242)    L. Noelle Malindzak (SBN 335622)<br>PASICH LLP, 1230 Rosecrans Avenue, Suite 690, Manhattan Beach, California 90266<br><br>TELEPHONE NO.: (424) 313-7860    FAX NO.: (424) 313-7890<br>EMAIL ADDRESS: KPasich@PasichLLP.com, NMalindzak@PasichLLP.com<br>ATTORNEY FOR *(Name):* Plaintiff Klutch Sports Group, LLC | **Electronically FILED by**<br>**Superior Court of California,**<br>**County of Los Angeles**<br>7/26/2024 3:58 PM<br>David W. Slayton,<br>**Executive Officer/Clerk of Court,**<br>**By C. Cervantes, Deputy Clerk** |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES |
|---|
| STREET ADDRESS: 111 N. Hill Street |
| MAILING ADDRESS: 111 N. Hill Street |
| CITY AND ZIP CODE: Los Angeles, CA 90012 |
| BRANCH NAME: Stanley Mosk |

| CASE NAME:<br>KLUTCH SPORTS GROUP, LLC v. RLI INSURANCE COMPANY |
|---|

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited**    [ ] **Limited**<br>(Amount      (Amount<br>demanded     demanded is<br>exceeds $35,000)   $35,000 or less) | [ ] Counter    [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **24STCV18643**<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400–3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [x] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is   [x] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):* Two
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 26, 2024

L. Noelle Malindzak

_____ ▶ _____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET                    CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
         or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner
      Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic
      relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Klutch Sports Group, LLC v. RLI Insurance Company | 24STCV18643 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Klutch Sports Group, LLC v. RLI Insurance Company | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☑ 1801 Insurance Coverage (not complex) | 1, ②, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Klutch Sports Group, LLC v. RLI Insurance Company | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Klutch Sports Group, LLC v. RLI Insurance Company | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation (Continued)** | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Klutch Sports Group, LLC v. RLI Insurance Company | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>9336 Civic Center Drive |
|---|---|
| CITY:<br>Beverly Hills | STATE:<br>CA | ZIP CODE:<br>90210 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: _07/26/2024_

_(signature)_

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

1  Kirk Pasich (SBN 94242)
   KPasich@PasichLLP.com
2  PASICH LLP
   10880 Wilshire Boulevard, Suite 2000
3  Los Angeles, California 90024
   Telephone: (424) 313-7860
4  Facsimile: (424) 313-7890
5
   L. Noelle Malindzak (SBN 335622)
6  NMalindzak@PasichLLP.com
   PASICH LLP
7  1230 Rosecrans Avenue, Suite 690
8  Manhattan Beach, California 90266
   Telephone: (424) 313-7860
9  Facsimile: (424) 313-7890
10
11 Attorneys for Plaintiff

Electronically FILED by
Superior Court of California,
County of Los Angeles
7/26/2024 3:58 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Cervantes, Deputy Clerk

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                  FOR THE COUNTY OF LOS ANGELES

14 KLUTCH SPORTS GROUP, LLC          Case No. 24STCV18643

15            Plaintiff,             COMPLAINT FOR:

16     v.                            1. BREACH OF CONTRACT; AND

17 RLI INSURANCE COMPANY,            2. TORTIOUS BREACH OF THE
                                     IMPLIED COVENANT OF GOOD
18            Defendant.             FAITH AND FAIR DEALING

19                                   DEMAND FOR JURY TRIAL

20

21

22        Plaintiff Klutch Sports Group, LLC ("Klutch"), brings this action against

23 defendant RLI Insurance Company ("RLI") and alleges as follows:

24                        NATURE OF THE ACTION

25        1.    Klutch is insured under an Asset Protection Policy that RLI sold

26 promising broad coverage. RLI agreed in its policy that Klutch could choose to have

27 RLI defend it in potentially covered lawsuits or to have RLI pay Klutch's attorneys'

28

─────────────────────────────────────────────────
                  COMPLAINT AND DEMAND FOR JURY TRIAL

1 | fees and costs incurred in the defense of such lawsuits, each option subject to
2 | different terms.

3 |      2.      Klutch was sued in a lawsuit that RLI acknowledged was potentially
4 | covered under its policy. RLI also acknowledged that it had "the duty to defend the
5 | reported matter." Despite admitting that its policy provided coverage and that it had
6 | a duty to defend Klutch, RLI wrongfully refused to pay a single penny incurred in
7 | Klutch's defense. Instead, RLI abandoned Klutch and repudiated its coverage duties,
8 | thereby forcing Klutch to defend the underlying lawsuit at its own expense and to
9 | pay hundreds of thousands of dollars in attorneys' fees and costs that RLI was
10 | obligated to pay but did not. RLI's failures and refusals to perform under its policy
11 | are breaches of the policy and the policy's implied covenant of good faith and fair
12 | dealing. By this lawsuit, Klutch seeks to recover the policy benefits to which it is
13 | entitled, plus interest, attorneys' fees, and punitive damages.

14 | **THE PARTIES**

15 |      3.      Klutch is a Delaware limited liability company with its principal place
16 | of business in California. Klutch regularly conducts business in the State of
17 | California and the County of Los Angeles. Klutch is a leading sports management
18 | and marketing company that represents professional athletes with regard to their
19 | on-court team contracts, as well as off-court marketing and other opportunities.
20 | Klutch is a subsidiary of United Talent Agency Holdings, Inc. ("UTA"). UTA is a
21 | talent and literary agency based in Beverly Hills, California.

22 |      4.      RLI is an Illinois corporation with its principal place of business in
23 | Peoria, Illinois. RLI is authorized to transact, and transacts, business in the State of
24 | California and the County of Los Angeles.

25 |      5.      RLI operates a website located at https://www.rlicorp.com/. RLI uses
26 | this website to market its insurance products, to represent the nature of its
27 | insurance products, policy underwriting, and claims handling, and to represent the
28 | quality of insurance and service its customers will get if they do business with RLI.

2
COMPLAINT AND DEMAND FOR JURY TRIAL

6.     In describing its "Brand," RLI states the following on its website:
"Responsive.  Everyone at RLI has a job for one reason: to serve the customer.
Without them, we cease to exist.  We focus on making life easier for brokers and
agents, so they can focus on quickly getting customers the coverage they need."
(https://www.rlicorp.com/our-brand).

7.     RLI proclaims that "[w]ith decades of industry experience, the RLI
Executive Products Group is well prepared to provide the coverage you and your
clients need." (https://www.rlicorp.com/RLI-executive-products-group).

8.     RLI also proclaims that "[s]ince 1965, we've been making a difference,
shouldering risks in niche insurance markets that give our customers the security to
create, explore, grow and prosper.  In 2015, we celebrated 50 years of innovation and
helping customers safeguard their assets and livelihoods."
(https://www.rlicorp.com/our-history).

### THE POLICY

9.     RLI sold Asset Protection Policy no. EPG0026852 to Klutch's parent
company, UTA, for the period March 25, 2021, to March 25, 2022 (the "Policy").  The
Policy contains a "STATE OF CALIFORNIA NOTICE TO POLICYHOLDER," but no
other state notice.  The Policy was delivered to UTA in Beverly Hills, California. A
true and correct copy of the Policy is attached hereto as Exhibit A and incorporated
herein by reference.

10.    Klutch is a UTA "Subsidiary," and therefore is an **Insured** under the
Policy, as RLI has acknowledged.[1]  Klutch's employees are **Insured Persons** under
the Policy, as RLI also has acknowledged.

11.    Among other things, the Policy provides $5,000,000 in Management and
Company Liability Coverage. (Policy, Management and Company Liability Coverage
Section & Declarations, Item 5.) This Coverage is subject to a Retention of "$150,000

---

[1] Terms in bold font are found in the Policy in bold font and defined therein.  They
are used in this Complaint as defined in the Policy.

1  Each **Claim**" (*id.*), except for **Claims** "based on, arising out of, directly or indirectly

2  resulting from, or in any way involving any **Antitrust Violation**," in which case that

3  "Antitrust Retention" is $250,000 "each **Claim**." (*Id.*, Antitrust Sublimit,

4  Coinsurance and Separate Retention Endorsement.") The Policy expressly states

5  that RLI's liability "with respect to **Loss** on account of each **Claim** shall apply only to

6  that part of **Loss** which is excess of the applicable Retention . . . ." (*Id.*, General

7  Terms and Conditions § III.B.)

8      12.    RLI offers insureds the opportunity to purchase certain additional

9  coverages when buying policies. One of those additional coverages is a "Duty to

10  Defend" coverage. As the declarations state, UTA exercised its option to purchase

11  additional "Duty to Defend Coverage." (*Id.*, Declarations, Item 5.)

12      13.    Because UTA exercised the option to purchase the additional Duty to

13  Defend Coverage, RLI agreed under the Policy to two separate defense-related duties

14  on RLI with respect to lawsuits against an **Insured**—a duty to pay for an **Insured**'s

15  defense and a duty to defend an **Insured**. Each provides different benefits to an

16  **Insured** and is subject to different terms. RLI's duty to pay for an Insured's defense

17  is part of its duty to pay **Loss** and is subject to the Policy's aggregate limit. RLI's

18  duty to defend, when purchased, is separately stated, with amounts that RLI pays as

19  part of its duty to defend not counting against, or being part of, the Policy's aggregate

20  limit.

21      14.    The Policy's Management and Company Liability Coverage states that

22  RLI "will pay on behalf of [an **Insured**] **Loss** incurred by the [**Insured** or **Insured**

23  **Persons**] as a result of **Claims** first made against" the **Insured** or **Insured**

24  **Persons**. (*Id.*, Management and Company Liability Coverage § I.B & C.)

25      15.    The Policy defines **Loss** to include "monetary amounts the **Insureds**

26  are legally obligated to pay as a result of a covered **Claim**, including but not limited

27  to monetary damages, judgments, settlements, . . . [and] **Defense Expenses** . . . ."

28  (*Id.*, Management and Company Liability Coverage § III.H.) It defines **Defense**

4

1  **Expenses** to include "reasonable fees and expenses (including without limitation
2  attorneys' fees and experts' fees) incurred in the investigation, defense or appeal of a
3  **Claim**, . . . . after notice of such **Claim** is given to the Insurer . . . ." (*Id.*, General
4  Terms and Conditions § II.D.)

5      16.    The Policy also states that when a **Claim** "includes both covered and
6  uncovered matters," then RLI is obligated to agree with an **Insured** on and pay an
7  allocation of **Defense Costs** or, absent an agreement, "advance on a current basis
8  **Defense Expenses** which [RLI] believes to be covered . . . until a different allocation
9  is negotiated or judicially determined." (*Id.*, Amend Section V. D., Defense and
10  Settlement; Allocation of Loss Endorsement.)

11      17.    The Policy states as follows regarding RLI's duty to defend:
12              If Duty to Defend coverage is granted pursuant to Item 5.
13              of the Declarations with respect to a purchased **Liability**
14              **Coverage Section**, the Insurer shall have the right and
15              duty to defend any **Claim** covered under such **Liability**
16              **Coverage Section**, even if any of the allegations are
17              groundless, false or fraudulent.  The Insurer's duty to
18              defend shall cease upon exhaustion of the applicable
19              limit of liability.

20  (*Id.*, General Terms and Conditions § V.A.)  As a matter of law, RLI's duty to defend
21  extends to any claim against an **Insured** that is potentially covered in whole or in
22  part, even if the predominant aspect of the claim is not covered.  The Policy does not
23  state that RLI's duty to defend arises only when **Loss** exceeds any applicable
24  retention, meaning that RLI has an immediate duty to defend an **Insured** as soon as
25  it is notified of a potentially covered **Claim**.

26      18.    The Policy has a Choice of Counsel Endorsement applicable to RLI's
27  Duty to Defend coverage.  It states in relevant part:

28

PASICH.

1      It is hereby understood and agreed that if Duty to Defend

2      coverage is granted pursuant to Item 5. of the

3      Declarations with respect to a purchased **Liability**

4      **Coverage Section**, the **Insured** shall have the right to

5      retain the law firm of <u>Freedman & Taitelman, LLP</u>

6      <u>Nationwide</u> (the "Firm") to defend it in a **Claim** covered

7      under such **Liability Coverage Section**, provided that:

8      (1) the Firm abide by the Insurer's Litigation

9      Management Guidelines (2) the Firm abide by the hourly

10     rates set forth below; and (3) the **Claim** is brought and

11     maintained in a jurisdiction where one or more attorneys

12     of the Firm are licensed to practice law.

13     If for any reason the Firm is unable to represent the

14     **Insured** in such a **Claim,** or fails to qualify as defense

15     counsel as provided above, the **Insured** may, upon the

16     express written consent of the Insurer, retain another

17     qualified defense firm, subject to the same requirements.

18     The following are the approved maximum standard

19     hourly rates:

20     Partner: $255/hour

21     Junior Partner: $235/hour

22     Associate: $210/hour

23     Paralegal: $90/hour

24 (*Id.*, Choice of Counsel Endorsement.)

25 The Policy does not have any such provision regarding **Defense Costs**.  In sum, RLI

26 has both a duty to defend Klutch and a separate duty to pay Klutch's **Defense Costs**

27 as part of **Loss**, each subject only to the specific terms of the Policy governing that

28 duty.

6

1    19.    The Policy has a condition regarding "Notice and Claim Reporting." It
2 states: "The **Insureds** shall give to the Insurer written notice of any **Claim** made
3 against the **Insureds** as soon as practicable after any General Counsel, Chief
4 Operating Officer and Chief Financial Officer or risk manager of an **Entity** first
5 learns of such **Claim** . . . ." (*Id.*, "Amend Notice and Claim Reporting Provisions"
6 Endorsement.) However, the condition also states, "The failure of the **Insureds** to
7 provide notice of a **Claim** as soon as practicable . . . shall not constitute a coverage
8 defense with respect to such **Claim** unless [RLI] establishes it was materially
9 prejudiced by such failure." (*Id.*)

10              **THE *EXCEL* LAWSUIT AND RLI'S BREACHES AND BAD FAITH**

11    20.    On March 8, 2022, Excel Sports Management, LLC ("Excel") filed a
12 lawsuit against Klutch and one of Klutch's employees. Excel asserted causes of
13 action for (1) breach of contract; (2) breach of the fiduciary duty of loyalty; (3) tortious
14 interference with contract; (4) tortious interference with prospective economic
15 advantage; (5) unfair competition; and (6) injunctive relief. Excel sought an award of
16 damages for breach of contract, breach of the fiduciary duty of loyalty, and tortious
17 interference with economic relations, attorneys' fees, and costs. A true and correct
18 copy of the *Excel* complaint is attached hereto as Exhibit B and incorporated by
19 reference.

20    21.    Klutch and its employee retained independent defense counsel to defend
21 against the *Excel* lawsuit.

22    22.    On April 21, 2022, Klutch notified RLI of the *Excel* lawsuit.

23    23.    On May 18, 2022, RLI sent a letter to Klutch agreeing to defend Klutch
24 and the employee in the *Excel* lawsuit. RLI acknowledged that "a potential for
25 coverage exists for the reported matter under the Policy" and stated, "RLI has the
26 duty to defend the reported matter." RLI also consented to Klutch's retention of
27 independent defense counsel. However, even though RLI acknowledged its duty to
28 defend, and no retention applied to RLI's duty to defend, RLI wrongfully took the

7

position that it need not pay until Klutch first paid a retention. Furthermore, even though the *Excel* lawsuit did not allege any **Antitrust Violation** (that is, price fixing, restraint of trade, monopolization, or violations of federal or state laws involving antitrust, monopoly, price fixing, price discrimination, predatory pricing, or restraint of trade), RLI wrongfully took the position that the *Excel* lawsuit was subject to a $250,000 Antitrust retention. And, even though the Policy's allocation condition applied only to RLI's duty to pay **Defense Costs**, not its duty to defend, RLI also improperly reserved rights to allocate what it would pay between covered and uncovered matters. In short, RLI ignored the express distinctions in its Policy between its duty to defend and its duty to pay **Defense Costs**, interpreting the two to limit the insurance afforded to Klutch and depriving Klutch of the benefits afforded by the two separate coverages.

24. Thereafter, Klutch sent correspondence to RLI telling RLI that it disagreed with RLI's coverage positions, explaining why, and reserving its rights. Klutch also timely responded to various information requests from RLI, providing status updates and the amount of attorneys' fees and costs incurred in the defense of the *Excel* lawsuit.

25. In or about November 2022, after receiving an adverse ruling on appeal, Excel dismissed the *Excel* lawsuit with prejudice, permanently abandoning all claims against Klutch and Klutch's employee.

26. In February 2023, having received no response from RLI to its explanations as to why RLI's coverage positions were wrong, Klutch followed up with RLI. Klutch told RLI that the *Excel* lawsuit had been dismissed, requested that RLI reimburse Klutch for at least the attorneys' fees and costs it incurred above the Policy's $150,000 retention, and continued to reserve all rights.

27. In April 2023, upon RLI's request, Klutch provided RLI with invoices reflecting the attorneys' fees and costs it incurred in defending the *Excel* lawsuit.

COMPLAINT AND DEMAND FOR JURY TRIAL

28.     On or about June 28, 2023, RLI told Klutch that it would not pay for any portion of the defense of Klutch or its employee because the amount fell within the Policy's $150,000 retention or the $250,000 Antitrust retention.  Klutch responded, explaining why RLI was wrong.  Klutch explained that RLI's contentions were misplaced, and that RLI's duty to defend was different from, and broader than, its duty to pay "Defense Expenses," and was not subject to any retention.  Klutch further explained that, at minimum and under the law, because Klutch's interpretation of the Policy was reasonable, that interpretation controlled, even if RLI had a reasonable, or more reasonable, interpretation.

29.     On October 2, 2023, RLI stated, "we reaffirm our prior determination that the covered Loss for the *Excel* Action cannot possibly exceed the Retention and thus will not result in a payment due."  Despite further communications among the parties, RLI continued to deny owing any money and has not paid any amount toward the attorneys' fees and costs incurred in the defense of the *Excel* lawsuit. As a result, Klutch has been deprived of the benefits owing under the Policy.

30.     To the extent not waived or otherwise excused, Klutch has complied with all terms and conditions precedent in the Policy.  Therefore, Klutch is entitled to all benefits of the Policy and to damages because of RLI's breaches.

**FIRST CAUSE OF ACTION**

*(Breach of Contract)*

31.     Klutch realleges and incorporates by reference paragraphs 1 through 30 above.

32.     RLI had a duty under the Policy, the law, and insurance industry custom and practice to defend Klutch and Klutch's employee in the *Excel* lawsuit and/or to pay the **Defense Costs** incurred in the defense of the *Excel* lawsuit. Klutch had the right to ask RLI to defend it and its employee or to pay for the **Defense Costs** incurred in the defense of it and its employee.  RLI's duties arose at least as of April 21, 2022, when Klutch notified RLI of the *Excel* lawsuit.

9

33. RLI has breached its duties by refusing to honor its duty to defend and duty to pay **Defense Costs** and by refusing to pay any portion of the amount that Klutch incurred in its defense and the defense of its employee in the *Excel* lawsuit.

34. As a direct and proximate result of RLI's breaches, Klutch has sustained at least $800,000 damages, in a precise amount to be proven at trial, plus interest on its damages at the legal rate.

## SECOND CAUSE OF ACTION

### *(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)*

35. Klutch realleges and incorporates by reference paragraphs 1 through 30, 32, and 33 above.

36. Implied in the Policy is a covenant that RLI would act in good faith and deal fairly with Klutch, that RLI would do nothing to interfere with Klutch's rights under the Policy, and that RLI would give at least the same level of consideration to Klutch's interests as it gave to its own interests.

37. RLI also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to conduct a prompt and thorough investigation, including as to all bases that might support Klutch's claims for insurance coverage, before reserving rights to deny and denying coverage. RLI also had a duty to immediately honor its duty to defend and its duty to pay **Loss**, including **Defense Costs**, and not to delay fulfilling its duties while it purported to consider its coverage duties.

38. Rather than honoring its duties, RLI acted in bad faith by, among other things:

a. Wrongfully and unreasonably asserting grounds for denying coverage that RLI knew, or should have known, are not supported by, and in fact are contrary to, the terms of the Policy, the law, insurance industry custom, practice, and standards, and the facts;

10

PASICH

b.    Unreasonably failing and refusing to honor its promises and

representations in the Policy and on its website;

c.    Giving greater consideration to its own interests than it gave to

Klutch's interests; and

d.    Otherwise acting as alleged above.

39.    In breach of the implied covenant of good faith and fair dealing, RLI

committed the acts alleged above for the purpose of consciously withholding from

Klutch the rights and benefits to which Klutch is entitled under the Policy.

40.    RLI's actions are contrary to Klutch's reasonable expectations,

established industry custom, practice, and standards, legal requirements, and the

express terms of the Policy.  They constitute bad faith.

41.    As a direct and proximate result of RLI's acts, Klutch has been damaged

in an amount to be proven at trial.  Also, pursuant to *Brandt v. Superior Court*, 37

Cal. 3d 813 (1985), Klutch is entitled to recover all attorneys' fees it reasonably

incurred, and continues to incur, in its efforts to obtain the benefits due under the

Policy that RLI has withheld, and is withholding, in bad faith, plus interest at the

legal rate.

42.    Klutch is informed and believes, and on that basis alleges, that RLI,

acting through one or more of its officers, directors, or other corporate employees

with substantial independent and discretionary authority over significant aspects of

its business, performed, authorized, or ratified the bad faith conduct alleged above.

43.    RLI's conduct exhibits a conscious disregard of Klutch's rights and

constitutes oppression, fraud, or malice. RLI engaged in a series of acts designed to

deny Klutch the benefits due under the Policy.  By acting as alleged above, given the

information, facts, and law to the contrary, RLI consciously disregarded Klutch's

rights and deprived Klutch of the full benefits that it promised to provide in its

Policy, thereby inflicting substantial damage on Klutch.  RLI ignored Klutch's

interests and concerns with the requisite intent to injure within, for example, the

11

1  meaning of California Civil Code section 3294.  Thus, Klutch is entitled to recover

2  punitive damages from RLI in an amount sufficient to punish and make an example

3  of RLI and to deter similar conduct in the future.

**PRAYER FOR RELIEF**

5  WHEREFORE, Klutch prays for relief as follows:

**ON THE FIRST CAUSE OF ACTION**

7  1.  For damages according to proof at the time of trial, plus interest;

**ON THE SECOND CAUSE OF ACTION**

9  2.  For damages according to proof at the time of trial, including reasonable

10  attorneys' fees incurred in obtaining the benefits due under the Policy, plus interest;

11  and

12  3.  For punitive damages in an amount to be determined at the time of

13  trial;

**ON BOTH CAUSES OF ACTION**

15  4.  For the costs of this lawsuit; and

16  5.  For such other, further, or different relief as the Court may deem just

17  and proper.

19  Dated:  July 26, 2024          PASICH LLP

20  By:

21  L. Noelle Malindzak
Attorneys for Plaintiff

PASICH

## DEMAND FOR JURY TRIAL

Klutch Sports Group, LLC hereby demands a trial by jury in this action.

Dated:  July 26, 2024

PASICH LLP

By: _____

L. Noelle Malindzak
Attorneys for Plaintiff

# EXHIBIT A

# RLI®   IMPORTANT NOTICE TO POLICYHOLDERS

## TERRORISM RISK INSURANCE ACT, AS AMENDED

Under the Terrorism Risk Insurance Act, as amended (the "**Act**"), we must make coverage for "**certified acts of terrorism**" available in the policies we offer. We notified you at the time of offer and purchase of the policy to which this Notice is attached that this coverage would be a part of your policy. The premium allocated for such coverage is shown on the Declarations page of the policy.

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States government under a formula established by federal law. Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

You should also know that the Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Specific coverage terms for terrorism, including limitations and exclusions, are more fully described in endorsements attached to the policy. Your policy may contain an exclusion for losses that are not eligible for federal reinsurance under the Act.

Definitions:

"**Certified act of terrorism**," as defined in Section 102(1) of the Act, means an act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Insured

**RLI** ®

**DIFFERENT WORKS**

RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Phone: (309) 692-1000

A stock insurance company,
herein called the Company.

# Asset Protection Policy Declarations

THE MANAGEMENT AND COMPANY LIABILITY, EMPLOYMENT PRACTICES AND THIRD PARTY DISCRIMINATION LIABILITY, FIDUCIARY LIABILITY, AND MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTIONS (WHICH-EVER ARE APPLICABLE) ARE ALL WRITTEN ON A CLAIMS MADE BASIS. EXCEPT AS OTHERWISE PROVIDED, THESE COVERAGE SECTIONS COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. THE CRIME PROTECTION COVERAGE SECTION IS WRITTEN ON A DISCOVERY BASIS. THE DECLARATIONS, APPLICATION, GENERAL TERMS AND CONDITIONS, ANY PURCHASED COVERAGE SECTIONS, AND ANY ENDORSEMENTS OR RIDERS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE PARENT COMPANY. PLEASE READ CAREFULLY.

Policy No: EPG0026852

Item 1. **Parent Company** (Name and Address):
United Talent Agency Holdings, Inc.
9336 Civic Center Drive
Beverly Hills, CA 90210

Item 2. **Policy Period:**   Inception Date: 03/25/2021      Expiration Date: 03/25/2022
Both days at 12:01 a.m. local time at the mailing address listed in Item 1. above.

Item 3. Premium:                                    $ 259,701

Item 4. Combined Aggregate Limit of Liability:      $ 12,000,000      All **Loss** under all
                                                                      **Liability Coverage
                                                                      Sections**, combined

Item 5. Coverage Schedule:

This Policy includes only those Coverage Sections designated below by "X" as purchased. If a Coverage Section is not expressly designated as purchased or if Duty to Defend coverage is not expressly designated as purchased for a Coverage Section, this Policy does not include such Coverage Section or such Duty to Defend coverage.

| | Coverage Section | Purchased | Coverage Section Limit of Liability | Retention* | Pending or Prior Date | Duty to Defend |
|---|---|---|---|---|---|---|
| A. | Management and Company Liability<br><br>1. Insuring Clause A. Insured Person Liability<br><br>2. Insuring Clause B. Company Reimbursement<br><br>3. Insuring Clause C. Company Liability<br><br>4. Derivative Demand Investigation and Books and Records Costs | ☒ Yes<br>☐ No | $ 5,000,000 Aggregate Limit of Liability | $ 150,000 Each **Claim** | 08/04/2004 | ☒ Yes<br>☐ No |
| B. | Employment Practices and Third Party Discrimination Liability | ☒ Yes<br>☐ No | $ 5,000,000 Aggregate Limit of Liability | $ 200,000 Each **Claim** for **Wrongful Employment Act**<br><br>$ 200,000 Each **Claim** for **Third Party Wrongful Act**<br><br>$ Nil All **Workplace Violence Incidents** combined | 01/13/2003 | ☒ Yes<br>☐ No |
| C. | Fiduciary Liability | ☐ Yes<br>☒ No | $ N/A Aggregate Limit of Liability | $ N/A Each **Claim** | N/A | ☐ Yes<br>☒ No |
| D. | Miscellaneous Professional Liability | ☐ Yes<br>☒ No | $ N/A Aggregate Limit of Liability | $ N/A Each **Claim** | N/A | ☐ Yes<br>☒ No |
| E. | Crime Protection | ☐ Yes<br>☒ No | See Item 9. below if the Crime Protection Coverage Section is purchased. | | None | N/A |

\*Except as required by state law or as otherwise provided in this Policy, no Retention shall apply under any **Liability Coverage Section** to (i) **Loss** which is subject to a Sublimit of Liability, or (ii) **Non-Indemnifiable Loss** incurred by **Insured Persons**.

**Liability Coverage Sections** which share Limit of Liability:

☐ A. Management and Company Liability

☐ B. Employment Practices and Third Party Discrimination Liability

☐ C. Fiduciary Liability

☐ D. Miscellaneous Professional Liability

☒ E. None

Insured

Item 6.  Additional Limits of Liability:

| | Coverage Section | Coverage Extension | Coverage Extension Included | Additional Limit of Liability |
|---|---|---|---|---|
| A. | Management and Company Liability | Additional Side A Limit for Insured Persons | ☒ Yes<br>☐ No | $ 1,000,000 |
| B. | Employment Practices and Third Party Discrimination Liability | Additional Defense Expenses Limit | ☒ Yes<br>☐ No | $ 1,000,000 |
| C. | Fiduciary Liability | Additional Defense Expenses Limit | ☐ Yes<br>☒ No | $ N/A |

Item 7.  Sublimits of Liability:

| | | Sublimit of Liability |
|---|---|---|
| A. | Management and Company Liability | |
| | Derivative Demand Investigative Costs | $ 250,000 |
| | Books and Records Costs | $ 50,000 |
| | Reputational Protection Costs | $ 50,000 |
| | Asset Protection Costs | $ 50,000 |
| B. | Employment Practices and Third Party Discrimination Liability | |
| | Workplace Violence | $ 250,000 |
| C. | Fiduciary Liability | |
| | Voluntary Compliance Program | $ N/A |
| | HIPAA Privacy Penalties | $ N/A |
| | Section 4975 Penalties | $ N/A |
| | Section 502(c) Penalties | $ N/A |
| | Pension Protection Act Penalties | $ N/A |
| | Affordable Care Act Penalties | $ N/A |
| D. | Crime Protection | |
| | Forgery or Alteration Legal Expenses | $ N/A |

Insured

Item 8.  Miscellaneous Professional Liability Coverage Section, if purchased:

    A.  **Professional Services**:
       N/A

    B.  Retroactive Date:       N/A

    C.  Prior Knowledge Date:   N/A

Item 9.  Crime Protection Coverage Section, if purchased:

| | Insuring Clauses | Purchased | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|---|---|
| A. | Employee Theft Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| B. | ERISA Theft Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| | Name of Employee Benefit Plans: N/A | | | |
| C. | Client Property Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| D. | Forgery or Alteration Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| E. | Inside the Premises Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| F. | Outside the Premises Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| G. | Computer Hacking Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| H. | Funds Transfer Fraud Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |
| I. | Money Orders and Counterfeit Paper Currency Coverage | ☐ Yes ☒ No | $ N/A | $ N/A |

| | | | | |
|---|---|---|---|---|
| J. | Fraudulently Induced Transfers Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| K. | Computer System Restoration Expense Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| L. | Credit, Debit or Charge Card Forgery Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |
| M. | Claims Expense Coverage | ☐ Yes<br>☒ No | $ N/A | $ N/A |

Item 10. Discovery Period for all purchased Liability Coverage Sections:

Year(s)          Additional Premium %

1 year                150%

Item 11. Notice to Insurer of Claims, potential Claims or Coverage Events:

RLI Insurance Company
9025 North Lindbergh Drive
Peoria, Illinois 61615
Fax: (866) 692-6796
E-mail:  new.claim@rlicorp.com
Attention: Claims Department

Item 12. Termination of Prior Policy(ies):  EPG0026506

Item 13. Endorsements:

Endorsements applicable to the General Terms and Conditions:

| | |
|---|---|
| RIL 2133C (01/15) | Notice - Terrorism Risk Insurance Act |
| RIL 110A (01/08) | Supplemental Declarations |
| EPG 900 (01/15) | Cap on Losses From Certified Acts of Terrorism |
| AGTC 602 (04/18) | Additional Insured Endorsement |
| AGTC 618 (04/18) | Class Action Retention Endorsement |
| RIL 200 (10/00) | Attention Policyholder |
| UW 20313I (01/15) | Policyholder Disclosure Notice of Terrorism Insurance Coverage |
| UW 20334 (10/11) | State of California - Notice to Policyholder |
| UW 20342 (03/12) | Policyholder Notice - OFAC |
| ILF 0001C (04/16) | Signature Page - Commercial Lines |
| MNU-AGTC 020 (02/20) | Amend Section V. D., Defense And Settlement; Allocation Of Loss Endorsement |

Insured

| MNU-AGTC-018 (04/21) | Consumer Data Privacy Claim Exclusion |
| MNU-AGTC-006 (04/21) | Specific Entity Exclusion |
| MNU-AGTC-005 (04/21) | Choice of Counsel Endorsement |
| MNU-AGTC-007 (04/21) | Specific Litigation Exclusion (II) |
| MNU-AGTC-021 (04/21) | Amend Notice and Claim Reporting Provisions |
| MNU-AGTC-011 (04/21) | Amend Discovery Period Endorsement |

Endorsements applicable to the Management and Company Liability Coverage Section:

| APDO 602 (04/18) | Additional Insured Endorsement |
| MNU-APDO-006 (04/21) | Intellectual Property Rights Infringement Exclusion |
| MNU-APDO-008 (04/21) | Publishing and Broadcasting Liability Exclusion |
| MNU-APDO-009 (04/21) | Amend Section IV. Exclusion C.5. |
| MNU-APDO-003 (04/21) | Antitrust Sublimit, Coinsurance and Separate Retention Endorsement |
| MNU-APDO-005 (04/21) | Network Security and Privavcy Exclusion |
| MNU-APDO-017 (04/21) | False Advertising Exclusion |
| MNU-APDO-052 (04/21) | For-Profit ODL Extension |

Endorsements applicable to the Employment Practices and Third Party Discrimination Liability Coverage Section:

| AEPL 500 (04/18) | Value Added Legal Services Flyer |
| AEPL 605 (04/18) | Violation Of Employee Privacy Expenses Sublimit |
| AEPL 606 (04/18) | Immigration Claim Sublimit Endorsement |
| AEPL 607 (04/18) | Amend Definition Of Harassment - Workplace Bullying |

Date: 4/13/2021

Authorized Company Representative

AGTC-P 100 (04/18)

Page 6 of 6

Insured

Policy Number: EPG0026852

**RLI Insurance Company**
(herein called the "Insurer")

# ASSET PROTECTION POLICY

## General Terms and Conditions

## I. TERMS AND CONDITIONS

Except for the General Terms and Conditions or unless stated to the contrary in any purchased coverage section listed in Item 5. of the Declarations, the terms and conditions of each coverage section of this Policy apply only to that section and shall not be construed to apply to any other coverage section of this Policy. In the event of any inconsistency between these General Terms and Conditions and the terms and conditions set forth in any coverage section of this Policy, the terms and conditions in such coverage section shall apply. Any defined term referenced in these General Terms and Conditions but defined in a coverage section shall, for purposes of coverage under that coverage section, have the meaning set forth in that coverage section. The General Terms and Conditions are attached to and incorporated with the purchased coverage sections listed in Item 5. of the Declarations.

## II. DEFINITIONS

When used in this Policy, the following terms, whether in the singular or plural, are defined below:

A. **"Application"** means the signed, written application for this Policy or any coverage section of this Policy and for any policy or coverage section issued by the Insurer during the three (3) years immediately preceding this Policy of which this Policy or any coverage section of this Policy is a direct or indirect renewal or replacement, including all documents and materials attached to or submitted with or incorporated into such application(s). All such application(s), documents, materials and filings are deemed attached to and incorporated into this Coverage Section.

B. **"Claim"** means, with respect to any **Liability Coverage Section**, those matters defined as a **Claim** in such coverage section.

C. **"Coverage Event"** means, with respect to the Crime Protection Coverage Section, the event or loss which must occur or be sustained or discovered in order to invoke coverage under such coverage section.

D. **"Defense Expenses"** means reasonable fees and expenses (including without limitation attorneys' fees and experts' fees) incurred in the investigation, defense or appeal of a **Claim**, or the opposition or revocation of an **Extradition** or any judicial ruling related thereto, after notice of such **Claim** is given to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of these General Terms and Conditions, including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond. **Defense Expenses** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or **Employees**.

E. **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Entity**.

F. **"Employee"** means the following:

1. any natural persons who were, now are or shall be in the regular service of the **Entity** in the ordinary course of the **Entity's** business, regardless whether such natural person is in a supervisory, co-worker or subordinate position or otherwise, and whom the **Entity** has the right to govern and direct in the performance of such service, including any such natural persons who are leased, temporary, part-time or seasonal employees of the **Entity**;

Insured

2.  any natural persons who were, now are or shall become independent contractors of the **Entity** who are treated under applicable law as employees of the **Entity**; and

3.  any volunteers or interns of the **Entity**;

provided (i) any such natural person who is leased to the **Entity** or who is such an independent contractor of the **Entity** shall qualify as an **Employee** only if the **Entity** agrees to indemnify such natural person, and (ii) coverage for any such leased employees or independent contractors shall be specifically excess of any indemnification or insurance otherwise available to such leased employees or independent contractors from the applicable leasing company or any other source.

G.  "**Entity**" means, collectively, the **Parent Company** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

H.  "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

I.  "**Executive Officer**" means with respect to any **Entity** the natural persons who were, now are or shall become such **Entity's** chief executive officer, chief financial officer or in-house general counsel or the functional equivalent of any of the foregoing positions.

J.  "**Extradition**" means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

K.  "**Financial Impairment**" means the status of the **Entity** resulting from:

1.  the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Entity**, or

2.  the **Entity** becoming a debtor in possession, as defined under U.S. Bankruptcy law or equivalent foreign law.

L.  "**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

M.  "**Foreign Policy**" means the standard insurance policy (including all mandatory endorsements, if any) approved by the Insurer for use within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded by a purchased coverage section under this Policy, but shall not include any commercial general liability, property or similar insurance policy.

N.  "**Insured Persons**" means with respect to each coverage section the natural persons defined as **Insured Persons** or **Insureds** in such coverage section.

O.  "**Insured Plans**" means the plans and programs defined as **Insured Plans** in the Fiduciary Liability Coverage Section, if purchased.

P.  "**Insureds**" means with respect to each coverage section the entities, plans and natural persons defined as **Insureds** in such coverage section.

Q.  "**Liability Coverage Sections**" means each of the purchased coverage sections listed in Item 5. of the Declarations, except the Crime Protection Coverage Section.

R.  "**Loss**" means with respect to any **Liability Coverage Section**, the amounts defined as **Loss** in such coverage section.

Insured

S. "**Manager**" means any natural person who is a former, present or future manager, managing member, general partner, member of the board of managers or equivalent executive of an **Entity** that is a limited liability company or limited partnership.

T. "**Non-Indemnifiable Loss**" means **Loss** incurred by an **Insured Person** for which the **Entity** is not permitted by common or statutory law to indemnify or is not financially able to indemnify by reason of **Financial Impairment**.

U. "**Parent Company**" means the company named in Item 1. of the Declarations, including any such organization as a debtor in possession under the United States bankruptcy law or an equivalent status under the law of any other country.

V. "**Policy Period**" means the period of time specified in Item 2. of the Declarations, subject to prior cancellation or termination in accordance with Section XV. CANCELLATION AND NONRENEWAL, of these General Terms and Conditions. If this period is less than or greater than one (1) year, then the **Policy Period** Limits of Liability and Sublimits of Liability specified in the Declarations shall be the Insurer's maximum liability under such coverage section for the entire period.

W. "**Pollutants**" means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutants** also means any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise, fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field. Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

X. "**Related Claims**" means all **Claims** for **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

Y. "**Subsidiary**" means:

1. any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position is owned, in any combination, by one or more **Entities**;

2. any organization in which one or more **Entities**, in any combination, have the right, pursuant to a written contract with or the by-laws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors or equivalent position of such organization;

3. any organization in which exactly fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent positions is owned, in any combination, by one or more **Entities**, if one or more **Entities** solely controls the management and operation of such organization pursuant to a written contract with the owners of the remaining fifty percent (50%) of such securities or voting rights;

4. any foundation, charitable trust or political action committee controlled or exclusively sponsored by one or more **Entities**; and

5. any other not-for-profit organization exclusively sponsored by one or more **Entities**;

provided that any coverage under this Policy for any **Subsidiary** and its **Insureds** shall only apply with respect to **Wrongful Acts** or **Coverage Events** occurring after the effective time such **Subsidiary** became a **Subsidiary** and prior to the effective time such **Subsidiary** ceased to be a **Subsidiary**.

Insured

Z.  "**Wrongful Acts**" means, with respect to any **Liability Coverage Section**, the acts, errors, omissions and other matters defined as **Wrongful Acts** in such coverage section.

AA. "**Wrongful Employment Act**" means, for purposes of any **Liability Coverage Section** other than the Employment Practices and Third Party Discrimination Liability Coverage Section, any actual or alleged: (i) wrongful dismissal, discharge or termination of employment; (ii) employment related misrepresentation; (iii) violation of any law, rule, regulation or public policy concerning employment; (iv) sexual or workplace harassment of any kind; (v) employment discrimination; (vi) wrongful failure to employ or promote; (vii) wrongful discipline; (viii) wrongful deprivation of career opportunity including a wrongful failure to hire or promote; (ix) failure to grant tenure; (x) negligent employment evaluation; (xi) breach of any oral, written or implied contract or quasi- employment contract concerning employment; or (xii) any other employment-related **Wrongful Act**.

## III. LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS

A.  Limits of Liability for Liability Coverage Sections

1.  Combined Aggregate Limit of Liability

    The amount set forth in Item 4. of the Declarations shall be the Insurer's maximum aggregate liability for all **Loss** covered under all **Liability Coverage Sections**, combined.

2.  Each Liability Coverage Section Limit of Liability

    The respective Limit of Liability for each **Liability Coverage Section**, as set forth in Item 5. of the Declarations, shall be the Insurer's maximum aggregate liability for all **Claims** under such **Liability Coverage Section**. The Limit of Liability for each **Liability Coverage Section** shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 4. of the Declarations.

3.  Shared Liability Coverage Section Limit of Liability

    The Insurer's maximum aggregate liability for all **Loss** covered under all **Liability Coverage Sections** which share a Limit of Liability, as designated at the end of Item 5. of the Declarations, combined, shall be the largest of such shared Limits of Liability. Such shared Limit of Liability shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 4. of the Declarations. This Paragraph further limits the Insurer's maximum liability under each such **Liability Coverage Section** and does not increase the respective separate Limit of Liability for each **Liability Coverage Section**.

4.  Additional Defense Expenses Limit of Liability

    If the Additional **Defense Expenses** Limit of Liability for the Employment Practices and Third Party Discrimination Liability Coverage Section or the Fiduciary Liability Coverage Section is purchased pursuant to Item 6. B. or 6. C. of the Declarations and if the Limit of Liability applicable to **Loss** covered under such respective coverage section is exhausted by payments by the Insurer, then the Insurer's liability for any **Defense Expenses** covered under such respective coverage section shall be subject to an additional Limit of Liability in an amount set forth in Item 6. B. or 6. C., respectively, of the Declarations. Such additional Limits of Liability shall be excess of any other valid and collectible insurance that is specifically excess of such respective coverage section and that covers such **Defense Expenses**.

5.  Sublimits of Liability

    The Sublimits of Liability set forth in Item 7. of the Declarations are part of and not in addition to any otherwise applicable Limit of Liability under this Policy. Except as otherwise expressly provided in this Policy, no Retention shall apply to any **Loss** which is subject to a Sublimit of Liability.

6. Defense Expenses Within Limit of Liability

Defense Expenses are part of and not in addition to the Limits of Liability applicable to the **Liability Coverage Sections**, and the payment by the Insurer of **Defense Expenses** reduces such Limits of Liability.

7. Limit of Liability Exhaustion and Payment

If with respect to any **Claim** the applicable Limit of Liability under this Policy is exhausted by payment of **Loss**, the Insurer's obligations, including without limitation any duty to defend, with respect to such **Claim** shall be completely fulfilled and extinguished. Subject to Section VI. of these General Terms and Conditions, the Insurer is entitled to pay **Loss** as it becomes due and payable by the **Insureds**, without consideration of other future payment obligations.

B. Retention for Liability Coverage Sections

The Insurer's liability under the **Liability Coverage Sections** with respect to **Loss** on account of each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in Item 5. of the Declarations. If more than one Retention applies to a single **Claim**, the largest applicable Retention shall be the maximum combined Retention for such **Claim**.

If an **Entity** refuses or fails within sixty (60) days after an **Insured Person's** request to indemnify or advance covered **Loss** incurred by **Insured Persons** or if an **Entity** is unable to indemnify or advance covered **Loss** incurred by **Insured Persons** due to its **Financial Impairment**, the Insurer shall pay such covered **Loss** without applying the applicable Retention. If the Insurer pays under this Policy any **Loss** incurred by an **Insured Person** for which the **Entity** is legally permitted or required and is financially able to advance or indemnify, then the **Entity** shall reimburse the Insurer for such amounts up to the applicable Retention, and such amounts shall become due and payable as a direct obligation of the **Entity** to the Insurer.

C. Limits of Liability and Retentions for Crime Protection Coverage Section

The Insurer's maximum liability and the applicable Retention under the Crime Protection Coverage Section shall be the respective Limits of Liability and Retention amounts as set forth in Item 9. of the Declarations. Such Limits of Liability and Retention amounts will be applied as described in the Crime Protection Coverage Section.

D. Single Claims

All **Related Claims** under the **Liability Coverage Sections** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Related Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**. In no event shall a single lawsuit or proceeding constitute more than one **Claim** subject to more than one Retention.

## IV. NOTICE AND CLAIM REPORTING PROVISIONS

A. Solely with respect to any Liability Coverage Section:

1. The **Insureds** shall give to the Insurer written notice of any **Claim** made against the **Insureds** as soon as practicable after any **Executive Officer** or risk manager of an **Entity** first learns of such **Claim**, but in no event later than (i) sixty (60) days after expiration of the **Policy Period**, if the Discovery Period is not purchased, or (ii) expiration of the Discovery Period, if purchased. The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section IV. A. 1. shall not constitute a coverage defense with respect to such **Claim** unless the Insurer establishes it was materially prejudiced by such failure.

2. If, during the **Policy Period** or the Discovery Period (if purchased):

    a.  any **Executive Officer** or risk manager of an **Entity** first becomes aware of a **Wrongful Act** which may subsequently give rise to a **Claim**, and

    b.  the **Insureds** give the Insurer written notice of such **Wrongful Act**, including a description of the **Wrongful Act**, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act** and the circumstances by which the **Executive Officer** or risk manager first became aware of such **Wrongful Act**, and

    c.  the **Insureds** request coverage under this Policy for any subsequent **Claim** arising from such **Wrongful Act**;

    then the Insurer will treat any such subsequent **Claim** as if it had been first made during the **Policy Period**.

B.  Solely with respect to the Crime Protection Coverage Section, the **Insureds** shall give to the Insurer written notice of any **Coverage Event** pursuant to the applicable notice provision in such Crime Protection Coverage Section.

C.  All notices under any coverage section of this Policy shall be in writing and given by prepaid express courier, certified mail, e-mail, or fax. Notice to any **Insureds** may be given to the **Parent Company** at the address as shown in Item 1. of the Declarations. Notice to the Insurer of any **Claim**, potential **Claim** or **Coverage Event** shall be given to the Insurer at the address set forth in Item 11. of the Declarations. All other notices to the Insurer under this Policy shall be given to the same addressee but to the attention of the Underwriting Department. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

## V. DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS

A.  If Duty to Defend coverage is granted pursuant to Item 5. of the Declarations with respect to a purchased **Liability Coverage Section**, the Insurer shall have the right and duty to defend any **Claim** covered under such **Liability Coverage Section**, even if any of the allegations are groundless, false or fraudulent. The Insurer's duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B.  If Duty to Defend coverage is not granted pursuant to Item 5. of the Declarations with respect to a purchased **Liability Coverage Section**, it shall be the duty of the **Insureds** and not the duty of the Insurer to defend any **Claims** covered under such **Liability Coverage Section**. The Insurer shall have the right and shall be given the opportunity to effectively associate with the **Insureds** in the investigation, defense, and settlement (including the negotiation of a settlement) of any **Claim** that appears reasonably likely to be covered in whole or in part by one or more purchased **Liability Coverage Sections**.

C.  If Duty to Defend coverage is not granted pursuant to Item 5. of the Declarations, the Insurer shall, upon request, advance on a current basis covered **Defense Expenses** on behalf of the **Insureds** within sixty (60) days after the Insurer's receipt of itemized invoices for such **Defense Expenses**. The **Insureds** agree that any **Defense Expenses** advanced by the Insurer shall be repaid to the Insurer by the **Insureds** severally according to their respective interests if and to the extent it is finally determined that such **Defense Expenses** are not covered under any purchased **Liability Coverage Section**.

D.  If in any **Claim** the **Insureds** who are afforded coverage for such **Claim** incur **Loss** covered by this Policy jointly with others (including **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered **Loss** based upon the relative legal exposures of all parties to covered and uncovered matters, provided that if Duty to Defend coverage is granted pursuant to Item 5. of the Declarations for such **Claim**, then one hundred percent (100%) of **Defense Expenses** covered in part under this Policy shall be allocated to covered **Loss**.

E.  The **Insureds** agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests including without limitation attendance at hearings and trials, assistance in effecting settlements, obtaining and giving evidence and obtaining the attendance of witnesses, copies of records, investigations and pleadings, and agree that in the event of a **Claim** the **Insureds** will do nothing that shall prejudice the Insurer's position or its potential or actual rights of recovery; provided that the failure of any **Insured** to give the Insurer such information, assistance or cooperation shall not impair the rights of any other **Insured** under this Policy.

F.  The Insurer may make any investigation it deems necessary and may, with the written consent of the **Insureds**, make any settlement of a **Claim** it deems expedient. If the Insurer receives an offer to settle any **Claim**, it shall notify the **Insureds** in writing of said offer within ten (10) days of receiving such offer. If the Insurer accepts said offer and settles the **Claim** (with the **Insureds'** written consent), the Insurer will notify the **Insureds** in writing within thirty (30) days after the effective date of such settlement.

G.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Defense Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Insurer's written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## VI. ORDER OF PAYMENT

A.  If the amount of any covered **Loss** which is otherwise due and owing by the Insurer under a **Liability Coverage Section** exceeds the then-remaining Limit of Liability applicable to such **Loss**, the Insurer shall pay such **Loss** (subject to the applicable Limit of Liability or Sublimit of Liability) in the following priority:

1.  First, the Insurer shall pay any such **Loss** which is **Non-Indemnifiable Loss**;

2.  Second, only if and to the extent the payment under subparagraph 1. above does not exhaust the applicable Limit of Liability or Sublimit of Liability, the Insurer shall pay the remaining portion of such **Loss**.

B.  Subject to the foregoing, the Insurer shall, upon receipt of a written request from the **Parent Company**, delay any payment of covered **Loss** (other than **Non-Indemnifiable Loss**) due and owing under a **Liability Coverage Section** until such time as the **Parent Company** designates, provided the Insurer's liability with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

## VII. CHANGE OF EXPOSURES

A.  New Subsidiaries or Insured Plans

If before or during the **Policy Period** an **Entity** acquires or creates a new **Subsidiary** or a new **Insured Plan** or acquires an entity by merger or consolidation, coverage under this Policy automatically shall apply to the new **Subsidiary** or **Insured Plan** and its **Insureds**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** (under a **Liability Coverage Section**) or a **Coverage Event** (under the Crime Protection Coverage Section) taking place after such acquisition or creation. This Paragraph does not apply to, and no coverage is afforded under, this Policy for any **Subsidiary** acquired during the **Policy Period** and its **Insureds** if such **Subsidiary** is a registered issuer of securities pursuant to the Securities Exchange Act of 1934, as amended, unless and to the extent the Insurer agrees by endorsement to this Policy to afford coverage for such **Subsidiary** and its **Insureds**.

B.  Acquisition of Parent Company

If, during the **Policy Period**:

1.  the **Parent Company** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or organization or group of persons or organizations acting in concert; or

2.  any person or organization or group of persons or organizations acting in concert shall acquire securities of the **Parent Company** or voting rights which results in such person, organization or group having the right to elect, appoint or designate at least fifty percent (50%) of the directors, **Managers** or equivalent executives of the **Parent Company**;

(either of the above events herein referred to as the "Transaction")

then coverage under this Policy shall continue in full force and effect until termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** (under a **Liability Coverage Section**) or a **Coverage Event** (under the Crime Protection Coverage Section) occurring prior to the effective time of the Transaction. There shall be no coverage under this Policy for any **Wrongful Act** or **Coverage Event** occurring after the effective time of the Transaction and the entire premium for this Policy shall be deemed fully earned as of such effective time. The **Parent Company** shall also then have the right to elect a Discovery Period described in Section VIII. of these General Terms and Conditions or a greater period as may be negotiated with the Insurer.

The **Parent Company** shall give the Insurer written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

C.  Cessation of Subsidiaries

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this Policy, provided such coverage shall apply (i) with respect to any **Liability Coverage Sections**, only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**, and (ii) with respect to the Crime Protection Coverage Section, only with respect to **Coverage Events** taking place prior to the date such organization ceased to be a **Subsidiary**.

D.  Cessation of Plans

If before or during the **Policy Period** an **Insured Plan** is terminated, coverage for such **Insured Plan** and its **Insureds** under the Fiduciary Liability Coverage Section, if purchased, shall continue until termination of such coverage section with respect to **Wrongful Acts** taking place before or after such termination.

## VIII. DISCOVERY PERIOD

A.  If:

1.  the **Parent Company** cancels any purchased coverage section listed in Item 5. of the Declarations; or

2.  either the Insurer or the **Parent Company** refuses or declines to renew any purchased coverage section listed in Item 5. of the Declarations for any reason; or

3.  a Transaction described in Section VII. CHANGE OF EXPOSURES, of these General Terms and Conditions occurs; and

within thirty (30) days after the end of the **Policy Period** the **Parent Company** elects to purchase the Discovery Period for all purchased **Liability Coverage Sections** and pays the additional premium set forth in Item 10. of the Declarations, then the coverage otherwise afforded by all purchased **Liability Coverage Sections** will be extended for the respective period set forth in Item 10. of the Declarations, but only for **Wrongful Acts** occurring before the end of the **Policy Period** or the date of any Transaction described in Section VII. CHANGE OF EXPOSURES, of these General Terms and Conditions, whichever is earlier. The Limit of Liability and any applicable Sublimit of Liability for the Discovery Period (if purchased) shall be part of, and not in addition to, any applicable Limit of Liability and Sublimit of Liability for the **Policy Period**.

Insured

B.  As a condition precedent to the right to exercise the Discovery Period, the total premium for the coverage section that the Discovery Period is applicable to must have been paid in full.

C.  If the Discovery Period is purchased, the entire premium for the Discovery Period shall be deemed fully earned at its commencement.

D.  Subject to the other terms, conditions and limitations in this Section VIII., the **Parent Company** may elect to purchase the Discovery Period for some but not all purchased **Liability Coverage Sections**. The Insurer shall promptly notify the **Parent Company** of the additional premium for such Discovery Period if the **Parent Company** requests such information.

## IX. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES

A.  Representations

The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and complete, are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy. This Policy is issued in reliance upon the truth and completeness of such representations.

B.  Severability

The **Application** shall be construed as a separate application for coverage by each of the **Insureds**. If with respect to any coverage section the **Application** contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Insurer under such coverage section, then the Insurer shall not be liable under such coverage section to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of or attributable to the facts that were not accurately and completely disclosed in the **Application** to the extent such **Loss** is incurred by:

1.  any **Entity** as indemnification of an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; or

2.  any **Entity** and its **Subsidiaries** and **Insured Plans** if an **Executive Officer** of such **Entity** knew the facts that were not truthfully disclosed in the **Application**;

whether or not such **Executive Officer** or **Insured Person** knew the **Application** contained such misrepresentation or omission. No knowledge of one **Insured Person** shall be imputed to any other **Insured Person** for purposes of this Section IX.

C.  Non-Rescindable Policy

The Insurer shall not have the right to rescind or void, in whole or in part, this Policy or any coverage section for any reason.

## X. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

In the event a liquidation or reorganization proceeding is commenced by or against an **Entity** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Entity** and the **Insureds** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such bankruptcy law, and (ii) agree not to oppose or object to any efforts by the Insurer, the **Entity** or any **Insured** to obtain relief from any such stay or injunction.

Insured

## XI. PRIOR POLICY LIBERALIZATION

If any purchased **Liability Coverage Section** under this Policy is a direct or indirect renewal of a prior policy or coverage section purchased by the **Parent Company** from the Insurer or its affiliates and if such prior policy or coverage section was written on a standard policy form used by the Insurer prior to this Policy's policy form ("Prior Policy Form"), then to the extent **Loss** resulting from a **Claim** first made during the **Policy Period** is not covered under this Policy but would be covered if this Policy included the Prior Policy Form, then this Policy is amended to follow and be subject to the broader terms and conditions in the Prior Policy Form, provided this Section XI. shall not amend or apply to (i) any provision in this Policy addressing limits of liability, retentions or coverages specifically not purchased under this Policy, (ii) any provision in this Policy that excludes or limits coverage for specific events, litigation or matters; or (iii) the Crime Protection Coverage Section.

## XII. COMPLIANCE WITH APPLICABLE TRADE AND ECONOMIC SANCTION LAWS

This Policy does not provide coverage that would be in violation of any applicable laws or regulations concerning trade or economic sanctions, including, but not limited to, those administered and enforced by the U.S. Treasury's Office of Foreign Asset Control (OFAC). Payment of **Loss** under this Policy shall be made only if such payment is in full and complete compliance with all economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by OFAC.

## XIII. TERRITORY AND VALUATION

Coverage under this Policy shall extend to **Wrongful Acts** or **Coverage Events** taking place, **Loss** incurred, or **Claims** made anywhere in the world, to the extent legally permitted.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

If permitted by applicable law, when determining coverage under this Policy for **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the Insurer shall apply to such **Claim** the terms and conditions of this Policy and, to the extent more favorable to the **Insureds**, the terms and conditions of the **Foreign Policy** in such **Foreign Jurisdiction**. However, this Paragraph shall not (i) apply to any provision of any **Foreign Policy** addressing limits of liability, retentions, other insurance, nonrenewal, duty to defend, defense within or without limits, or any claims-made provisions, and (ii) amend any provision in this Policy that excludes or limits coverage for specific events, litigation or matters.

Any **Loss** incurred by an **Entity** in a **Foreign Jurisdiction** shall be deemed, at the written direction of the **Parent Company**, a **Loss** of the **Parent Company** payable to the **Parent Company** at the address shown in Item 1. of the Declarations. Any such payment by the Insurer to the **Parent Company** pursuant to this paragraph shall fully discharge the Insurer's liability under this Policy for such **Loss**. Any **Loss** incurred by an **Insured Person** in a **Foreign Jurisdiction** and which is not indemnified or paid by an **Entity** shall, to the extent permissible under applicable law, be paid to such **Insured Person** in a jurisdiction mutually acceptable to such **Insured Person** and the Insurer.

## XIV. ACTION AGAINST THE INSURER

A. No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the Insurer.

B. No person or organization shall have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives. Bankruptcy or insolvency of the **Insureds** or of the estate of an **Insured** shall not relieve the Insurer of any of its obligations hereunder.

C. Only if requested by the **Insureds**, the Insurer shall submit any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel shall consist of one arbitrator selected by the **Insureds**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

D. In addition to the terms, conditions, and limitations in subparts A., B., and C., above, no action shall lie against the Insurer with respect to loss under the Crime Protection Coverage Section:

1. Until ninety (90) days after a sworn proof of loss is filed with the Insurer; and

2. Unless such action is brought within two (2) years from the date the loss was discovered.

## XV. CANCELLATION AND NONRENEWAL

A. This Policy as a whole or any purchased coverage section listed in Item 5. of the Declarations shall terminate at the earliest of the following times:

1. the effective date of termination specified in a prior written notice by the **Parent Company** to the Insurer, provided neither this Policy nor any purchased coverage section listed in Item 5. of the Declarations may be terminated by the **Parent Company** if the **Policy Period** is more than eighteen (18) months;

2. ten (10) days after the receipt by the **Parent Company** of a written notice of termination from the Insurer based upon failure to pay premium due, unless such premium is received by the Insurer prior to such tenth (10th) day;

3. at such other time as may be agreed upon by the Insurer and the **Parent Company**; or

4. upon expiration of the **Policy Period** as set forth in Item 2. of the Declarations.

B. The Insurer shall refund the unearned premium computed at customary pro-rata rates if this Policy is terminated by the **Parent Company**. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable. If the **Policy Period** is more than eighteen (18) months, the premium charged for this Policy shall be fully earned at inception of the **Policy Period**. The Insurer shall not be required to renew this Policy upon its expiration.

C. If the Insurer decides not to renew this Policy, the Insurer will mail or deliver to the **Parent Company** written notice of nonrenewal at least sixty (60) days prior to the end of the **Policy Period**.

## XVI. OTHER INSURANCE

If any **Loss** is insured under any other valid and collectible policy(ies), prior or current, then this Policy shall cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of payment from such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy. This Policy will not be subject to the terms of any other insurance. However, this Policy shall apply on a primary basis with respect to (i) any personal umbrella or other personal liability policy which covers an **Insured Person** but not any other **Insured**, or (ii) any private equity or venture capital liability, general partner liability or other similar management or professional liability insurance policy available to an **Insured Person**.

## XVII. ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Persons** shall be considered an **Insured Person** under the **Liability Coverage Sections** but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**. No coverage is provided for any wrongful act or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All provisions in these General Terms and Conditions and the respective **Liability Coverage Section** applicable to **Loss** incurred by the **Insured Person** shall also apply to covered loss incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

## XVIII. AUTHORIZATION CLAUSE

By acceptance of this Policy, the **Parent Company** agrees to act on behalf of the **Insureds** with respect to giving and receiving notices, paying premiums and receiving any return premiums that may become due under this Policy, and agreeing to endorsements. The **Insureds** agree that the **Parent Company** may act on their behalf with respect to such matters.

## XIX. ASSIGNMENT

This Policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

## XX. TERMINATION OF PRIOR POLICIES

Any policies issued by the Insurer or its affiliates and specified in Item 12. of the Declarations shall terminate, if not already terminated, as of the inception date of this Policy.

## XXI. SUBROGATION

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation any right of recovery from an **Entity** for **Loss** incurred by **Insured Persons** which is indemnifiable by the **Entity**. The **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insured**. In any subrogation claim against the **Entity** to enforce the **Insured Persons'** right of indemnification, the shareholder and board of director resolutions of the **Entity** shall be deemed to provide indemnification to the fullest extent permitted by law. The Insurer shall not exercise its right of subrogation against an **Insured Person** with respect to payments under any **Liability Coverage Section**.

Any such recoveries, less the cost of obtaining them, will be distributed as follows:

1. to the **Insured** and the insurer of any other policy specifically excess of this Policy, until they are reimbursed for any **Loss** that they sustain that exceeds the sum of this Policy's applicable Limit of Liability and applicable Retention, if any;

2. then to the Insurer, until the Insurer is reimbursed for the payment made under this Policy; and

3. then to the **Insureds**, until they are reimbursed for their payment of any applicable Retention.

In the event the Insurer recovers amounts it paid under this Policy, the Insurer will reinstate the applicable Limit(s) of Liability and Sublimit(s) of Liability of this Policy to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery. The Insurer assumes no duty to seek a recovery of any amounts paid under this Policy.

## XXII. ALTERATION, ASSIGNMENT AND HEADINGS

By acceptance of this Policy, all **Insureds** and the Insurer agree that this Policy (including the Declarations, **Application**, all purchased coverage sections and any endorsements attached to this Policy) constitute the entire agreement between the parties. The terms, conditions and limitations of this Policy can be waived or changed only by endorsement hereto.

This Policy and any all rights hereunder are not assignable without the prior written consent of the Insurer, which consent shall be in the sole and absolute discretion of the Insurer.

The titles and headings to the various sections, subsections and endorsements of this Policy are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such sections, subsections or endorsements.

## XXIII. STATE AMENDATORY INCONSISTENCY

In consideration of the premium charged, it is hereby understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the **Insured**.

**RLI Insurance Company**
9025 North Lindbergh Drive, Peoria, IL 61615

## SUPPLEMENTAL DECLARATIONS

Policy No:  EPG0026852

Named Insured and Mailing Address
United Talent Agency Holdings, Inc.
9336 Civic Center Drive
Beverly Hills, CA 90210

Portion of premium attributable to coverage for Certified Acts of Terrorism    $0

RIL 110A (01/08)

Coverage: **General Terms and Conditions**                    Insurer: **RLI Insurance Company**

Effective date of                                              To be attached to and form part of
this endorsement: **03/25/2021**                               Policy No. **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

With respect to any one or more certified acts of terrorism, we will not pay any amount for which we are not responsible under the terms of the Terrorism Risk Insurance Act, as amended ("Terrorism Risk Insurance Act"), due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act. The Terrorism Risk Insurance Act includes the following criteria for a certified act of terrorism:

1.   The act resulted in aggregate losses in excess of $5 million; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to certified acts of terrorism under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to the pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Under this formula, the United States government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

We will have no liability for any certified act of terrorism should the Terrorism Risk Insurance Act be terminated, not renewed, allowed to expire, or otherwise discontinued. Regardless of when during the Policy Period such termination, nonrenewal, expiration, or discontinuation occurs, our liability for any certified act of terrorism will cease immediately at the date and time of such termination, nonrenewal, expiration, or discontinuation of the Terrorism Risk Insurance Act.

If the Terrorism Risk Insurance Act is terminated, not renewed, allowed to expire, or otherwise discontinued during the Policy Period and we have charged premium for coverage under the Terrorism Risk Insurance Act, we will reimburse the premium, if any, charged for coverage under the Terrorism Risk Insurance Act on a customary pro rata basis.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **03/25/2021**

To be attached to and form part of
Policy No. **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED ENDORSEMENT

It is hereby understood and agreed that Item 1. **Parent Company** of the Declarations is amended to include the following as additional **Insureds**:

Dear Media, LLC
UTA Brant Advisor, LP
UTA Brant Management, LLC
UTA Raze Holdings, LLC
UTA Radcliff Holdings, LLC

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# Asset Protection Policy

Coverage: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **03/25/2021**

To be attached to and form part of
Policy No. **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CLASS ACTION RETENTION ENDORSEMENT

It is hereby understood and agreed that:

1.  Item 5. B. of the Declarations, is amended by adding the following:

    "$ 350,000_____ each **Class Action Claim**"

2.  Section III. LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS, of the General Terms and Conditions is amended by adding the following:

    "The Retention set forth in Item 5. B. of the Declarations will apply to all **Loss** resulting from each **Class Action Claim**."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AGTC 618 (04/18)

Page 1 of 1

Insured

Policy Number:  EPG0026852



**RLI Insurance Company**
Peoria, Illinois 61615

# ATTENTION POLICYHOLDER:

## KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false, incomplete, or misleading information, or conceals information concerning any material fact thereto, commits a fraudulent insurance act, which is a crime punishable by incarceration, and shall also be subject to civil penalties.

Insured



# POLICYHOLDER DISCLOSURE
# NOTICE OF
# TERRORISM INSURANCE COVERAGE

Coverage for "acts of terrorism" is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended (the "Act"), the definition of "act of terrorism" has changed. As defined in Section 102(1) of the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The "acts of terrorism" as defined in Section 102(1) of the Act shall be sometimes referred to herein as "certified acts of terrorism."

Under your coverage, any losses resulting from "certified acts of terrorism" may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits the United States Government reimbursement as well as the insurers' liability for losses resulting from "certified acts of terrorism" when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for "certified acts of terrorism" is $ 0 _____, and does not include any charges for the portion of losses covered by the United States Government under the Act.

Policy Number: EPG0026852



**RLI Insurance Company**
Peoria, Illinois 61615

# STATE OF CALIFORNIA

# NOTICE TO POLICYHOLDER

If you cancel the policy prior to the end of the policy period, the return premium may be calculated other than on a pro rata basis.  The premium returned may be reduced by up to 10% of the pro rata return premium and will be calculated at the time of cancellation.

Insured

Policy Number: EPG0026852



**RLI Insurance Company**
Peoria, Illinois 61615

# NOTICE TO POLICYHOLDERS

## REGARDING THE UNITED STATES TREASURY DEPARTMENT – OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

This Policyholder Notice does not provide coverage nor can it be construed to replace any provisions of your policy. Please read your policy carefully to determine your rights, duties, and what is and what is not covered by your policy. This Notice should only be used to provide information concerning the possible impact of your insurance coverage as it relates to directives issued by OFAC.

**PLEASE READ THIS NOTICE CAREFULLY.**

OFAC administers and enforces economic and trade sanctions and places restrictions on certain transactions. OFAC acts pursuant to Executive Orders of the President of the United States and specific legislation. OFAC has identified and named numerous foreign agents, front organizations, terrorists, terrorist organizations, and narcotics traffickers, among others, as "Specially Designated Nationals and Blocked Persons." The complete list can be found on the United States Treasury website – http://www.treas.gov/ofac.

Various trade or economic sanctions and other laws or regulations prohibit us from providing insurance in certain circumstances. In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance contract is considered a blocked or frozen contract and will be considered null and void. When an insurance policy is considered to be a blocked or frozen contract, all provisions of this insurance will be immediately subject to OFAC, and neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

UW 20342 (03/12)                                                                                           Page 1 of 1

Policy Number: EPG0026852                                                    RLI Insurance Company

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

*Jeffrey D Jick*

Corporate Secretary

*Craig W. Klut*

President & COO

ILF 0001C (04/16)

Insured

# Asset Protection Policy

Coverage:  **General Terms and Conditions**

Insurer:  **RLI Insurance Company**

Effective date of
this endorsement:  **03/25/2021**

To be attached to and form part of
Policy No.  **EPG0026852**

Issued to:  **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND SECTION V. D., DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS ENDORSEMENT

It is hereby understood and agreed that Section V. D., DEFENSE AND SETTLEMENT; ALLOCATION OF LOSS, of this Policy is deleted in its entirety and replaced with the following:

D.  If in any **Claim** the **Insureds** who are afforded coverage for such **Claim** incur **Loss** covered by this Policy jointly with others (including **Insureds**) who are not afforded coverage for such **Claim**, or incur an amount consisting of both **Loss** covered by this Policy and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered **Loss** based upon the relative legal exposures of all parties to covered and uncovered matters. If there can be an agreement on an allocation of **Defense Expenses**, the Insurer shall, upon request, advance on a current basis **Defense Expenses** allocated to covered **Loss**. If there can be no agreement on an allocation of **Defense Expenses**, the Insurer shall advance on a current basis **Defense Expenses** which the Insurer believes to be covered under any purchased **Liability Coverage Section** until a different allocation is negotiated or judicially determined.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CONSUMER DATA PRIVACY CLAIM EXCLUSION

It is hereby understood and agreed that:

1.  The Insurer shall not be liable for any **Loss** on account of any **Consumer Data Privacy Claim**.

2.  The term "**Consumer Data Privacy Claim**" shall mean any **Claim** based upon, arising out of, directly or indirectly resulting from, or in consequence of, in whole or in part, any actual or alleged violation of:

    a.  The Illinois' Biometric Information Privacy Act (740 ILCS 14/1 et seq.) ("BIPA") or any amendments thereto or any rules or regulations promulgated thereunder;

    b.  The Texas Business and Commerce Code - BUS & COM 503.001 Capture or Use of Biometric Identifier or any amendments thereto or any rules or regulations promulgated thereunder;

    c.  California Consumer Privacy Act of 2018 ("CCPA") or any amendments thereto or any rules or regulations promulgated thereunder; or

    d.  Any other law, ordinance, regulation, statute or common law relating to the improper collection, storage, or destruction of **Consumer Data**.

3.  The term "**Consumer Data**" shall mean information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household. This includes, but is not limited to, biometric information.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SPECIFIC ENTITY EXCLUSION

It is hereby agreed and understood that this Policy shall afford no coverage for United Entertainment Group Holdings LLC and JU Big Sky Investment, LLC nor shall United Entertainment Group Holdings LLC and JU Big Sky Investment, LLC be considered an **Insured** under this Policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**                    Insurer: **RLI Insurance Company**

Effective date of                                                      To be attached to and form part of
this Endorsement: **03/25/2021**                                       Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CHOICE OF COUNSEL ENDORSEMENT

It is hereby understood and agreed that if Duty to Defend coverage is granted pursuant to Item 5. of the Declarations with respect to a purchased **Liability Coverage Section**, the **Insured** shall have the right to retain the law firm of Freedman & Taitelman, LLP Nationwide (the "Firm") to defend it in a **Claim** covered under such **Liability Coverage Section**, provided that: (1) the Firm abide by the Insurer's Litigation Management Guidelines (2) the Firm abide by the hourly rates set forth below; and (3) the **Claim** is brought and maintained in a jurisdiction where one or more attorneys of the Firm are licensed to practice law.

If for any reason the Firm is unable to represent the **Insured** in such a **Claim,** or fails to qualify as defense counsel as provided above, the **Insured** may, upon the express written consent of the Insurer, retain another qualified defense firm, subject to the same requirements set forth above.

The following are the approved maximum standard hourly rates:
Partner: $255/hour
Junior Partner: $235/hour
Associate: $210/hour
Paralegal: $90/hour

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**          Insurer: **RLI Insurance Company**

Effective date of                                          To be attached to and form part of
this Endorsement: **03/25/2021**                           Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIC LITIGATION EXCLUSION (II)

It is hereby understood and agreed that the Insurer shall not be liable for **Loss** on account of any **Claim** made against any **Insureds, Insured Persons** or the **Entity** based upon, arising out of, directly or indirectly resulting from, or in consequence of the following matter(s):

Markel American Corporation Directors & Officers and Employment Practices Loss Runs, including but not limited to:

Based upon arising out of the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein for the Writers Guild of America – Anti-Packaging event Claim # ML403979-1

Based upon arising out of the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein for Claim #ML402939-1

Based upon arising out of the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein for Claim # ML400318-1

Based upon arising out of the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein for Claim # ML275036 -1

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND NOTICE AND CLAIM REPORTING PROVISIONS

It is hereby understood and agreed that Section IV. A., NOTICE AND CLAIM REPORTING PROVISIONS, of this Policy is deleted in its entirety and replaced with the following:

A.  Solely with respect to any Liability Coverage Section:

1.  The **Insureds** shall give to the Insurer written notice of any **Claim** made against the **Insureds** as soon as practicable after any General Counsel, Chief Operating Officer and Chief Financial Officer or risk manager of an **Entity** first learns of such **Claim**, but in no event later than (i) sixty (60) days after expiration of the **Policy Period**, if the Discovery Period is not purchased, or (ii) expiration of the Discovery Period, if purchased. The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section IV. A. 1. shall not constitute a coverage defense with respect to such **Claim** unless the Insurer establishes it was materially prejudiced by such failure.

2.  If, during the **Policy Period** or the Discovery Period (if purchased):

    a.  any General Counsel, Chief Operating Officer and Chief Financial Officer or risk manager of an **Entity** first becomes aware of a **Wrongful Act** which may subsequently give rise to a **Claim**, and

    b.  the **Insureds** give the Insurer written notice of such **Wrongful Act**, including a description of the **Wrongful Act**, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act** and the circumstances by which the General Counsel, Chief Operating Officer and Chief Financial Officer or risk manager first became aware of such **Wrongful Act**, and

    c.  the **Insureds** request coverage under this Policy for any subsequent **Claim** arising from such **Wrongful Act**;

    then the Insurer will treat any such subsequent **Claim** as if it had been first made during the **Policy Period**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **General Terms and Conditions**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**AMEND DISCOVERY PERIOD ENDORSEMENT**

It is hereby understood and agreed that Item 10. of the Declarations, Discovery Period, is deleted in its
entirety and replaced with the following:

Item 10. Discovery Period for all purchased liability Coverage Sections:

| Year(s) | Additional Premium % |
|---------|----------------------|
| 1 year | 150% $389,552 |
| 2 years | 175% $454,477 |
| 3 years | 200% $519,402 |

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.



# VALUE ADDED LEGAL SERVICES*

## RLI INSUREDS GAIN ACCESS TO GORDON & REES EMPLOYMENT LAW GROUP

The Employment Law Group of Gordon & Rees consists of nearly 300 attorneys nationwide with the expertise to handle and consult on virtually any employment law issue.

**INSUREDS HAVE ACCESS TO LEGAL EXPERTISE IN:**

- Recognizing and Preventing Unlawful Harassment, Discrimination, and Retaliation
- Best Practices to Interview, Hire, Discipline & Fire
- Conducting Effective Performance Evaluations
- Addressing and Protecting Employee Privacy Concerns
- Conducting Workplace Investigations
- Leave Laws: FMLA, ADA, and More
- Diversity in the Workplace/ Affirmative Action
- ADR: Arbitration, Mediation, and More
- Terminations and Reductions in Force
- How to Improve the Workplace Environment and Morale
- Social Media Issues

### NATIONAL EMPLOYMENT ISSUE COUNSELING HOTLINE

RLI has arranged for the Employment Law Group of Gordon & Rees, which consists of nearly 300 attorneys nationwide, to provide a National Employment Issue Online Counseling Helpline — free of charge. Insureds gain access to an experienced team of employment lawyers with expertise in all facets of employment law. RLI insureds have legal counsel available to answer questions and guide them through issues in real time. Consultation regarding pre-claim investigations, employee issues/concerns, wage & hour issues, and any employment law related issue is just an email away.



**Have an employment related question?**
Contact a Gordon & Rees attorney at RLIEPL@grsm.com.
You may expect a response within one business day.

### POLICY/HANDBOOK/WAGE & HOUR AUDITS

RLI Insureds gain access to audits of Insured's employment policies, handbooks, and wage & hour practices — free of charge. Gordon & Rees provides RLI Insureds up to 5 hours of comprehensive audits free of charge each calendar year. If Insureds need additional auditing and corporate consulting, Insureds gain access to RLI's preferred attorney rates with Gordon & Rees.

### NATIONAL EMPLOYMENT LAW WEBINAR SERIES PRESENTATIONS

RLI insureds gain access to the National Gordon & Rees Webinar Series, with monthly presentations that focus on key issues and trends facing managers and human resources. RLI Insureds can even request a Webinar focus on a specific issue.

Each webinar is designed for those who need to make well-informed employment decisions on a day-to-day basis including human resources specialists, generalists, payroll managers, upper

MONTHLY EMPLOYMENT WEBINARS
http://employmentwebinars.gordonrees.com

WEBINAR ARCHIVE
http://employmentwebinars.gordonrees.com/archive

level managers, in-house counsel, insurance carriers, and upper management individuals. The webinars focus not only on the law, but also on practical tips for individuals to more effectively manage their employment relationships. The webinars are also archived to enable access to individuals who could not participate in the live program.

### COUNSELING AND TRAINING

RLI Insureds also gain access to Gordon & Rees's Counseling and Training Programs, which counsel clients on compliance with laws in the areas of hiring, promotion, discipline, termination, compensation, harassment, substance abuse, wage and hour, and affirmative action and independent contractor arrangements.

*The value added services are not insurance and are only available for Insureds under RLI's Asset Protection Policy. RLI does not provide legal services and is not responsible and assumes no liability for any information or services provided by Gordon & Rees. RLI reserves the right to discontinue any of the services at any time.


GORDON&REES
SCULLY MANSUKHANI

 **RLI®** VALUE ADDED LEGAL SERVICES

## NATIONAL EMPLOYMENT PLATFORM

### OFFICE LOCATIONS

**ALABAMA**
Birmingham

**ARIZONA**
Phoenix

**CALIFORNIA**
Carlsbad
Los Angeles
Oakland
Orange County
Sacramento
San Diego
San Francisco

**COLORADO**
Denver

**DELAWARE**
Wilmington

**CONNECTICUT**
Hartford

**FLORIDA**
Miami
Tampa

**GEORGIA**
Atlanta

**ILLINOIS**
Chicago

**KENTUCKY**
Louisville

**MARYLAND**
Baltimore

**MASSACHUSETTS**
Boston

**MICHIGAN**
Detroit

**MISSOURI**
St. Louis

**MONTANA**
Missoula

**NEBRASKA**
Lincoln
Omaha

**NEVADA**
Las Vegas

**NEW JERSEY**
Florham Park

**NEW YORK**
Long Island
New York
Westchester

**NORTH CAROLINA**
Raleigh

**OHIO**
Cincinnati
Cleveland
Columbus

**OKLAHOMA**
Oklahoma City

**OREGON**
Portland

**RHODE ISLAND**
Providence

**PENNSYLVANIA**
Harrisburg
Philadelphia
Pittsburgh

**SOUTH CAROLINA**
Charleston

**SOUTH DAKOTA**
Rapid City

**TEXAS**
Austin
Dallas
Houston

**VIRGINIA**
Tysons Corner

**UTAH**
Salt Lake City

**WASHINGTON**
Seattle

**WASHINGTON, D.C.**

**WEST VIRGINIA**
Wheeling

**WISCONSIN**
Milwaukee



● Gordon & Rees office locations

▨ States in which Gordon & Rees attorneys are admitted to practice.
Attorneys are also admitted in Mexico, Canada, and Hong Kong.

### GORDON & REES ATTORNEYS ADMITTED TO PRACTICE:

- Alabama
- Arizona
- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Florida
- Georgia
- Hawaii
- Idaho

- Illinois
- Indiana
- Iowa
- Kansas
- Kentucky
- Maine
- Maryland
- Massachusetts
- Michigan
- Minnesota
- Mississippi
- Missouri

- Montana
- Nebraska
- Nevada
- New Hampshire
- New Jersey
- New Mexico
- New York
- North Carolina
- Ohio
- Oklahoma
- Oregon
- Pennsylvania

- Rhode Island
- South Carolina
- South Dakota
- Tennessee
- Texas
- Utah
- Virginia
- Washington
- West Virginia
- Wisconsin
- Wyoming

Gordon Rees Scully Mansukhani (Gordon & Rees) is a national litigation and business transactions firm with more than 800 lawyers in 50 offices across the United States. Founded in 1974, Gordon & Rees is recognized among the fastest growing and 40 largest law firms in the country.

www.grsm.com

**GORDON&REES**
**SCULLY MANSUKHANI**

Policy Number: EPG0026852                                    RLI Insurance Company

# ═══ ASSET PROTECTION POLICY ═══

## Employment Practices and Third Party Discrimination Liability Coverage Section

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insureds agree as follows:

## I. INSURING CLAUSES

A.  Employment Practices Liability Coverage

The Insurer will pay on behalf of the **Insureds**, **Loss** incurred by the **Insureds** as a result of **Claims** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), by or on behalf of a past, present, prospective or alleged **Employee** for a **Wrongful Employment Act**.

B.  Third Party Discrimination Liability Coverage

The Insurer will pay on behalf of the **Insureds**, **Loss** incurred by the **Insureds** as a result of **Claims** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), by or on behalf of a **Third Party** for a **Third Party Wrongful Act**.

C.  Continuity Coverage

If a **Claim** for a **Wrongful Employment Act** is first made against the **Insureds** during a prior employment practices liability policy or coverage section, if any, issued by the Insurer to the **Entity** for the policy period immediately preceding this Coverage Section's **Policy Period** ("Prior Policy") and if such prior **Claim** ("Prior Claim") is not covered under the Prior Policy solely because notice of the Prior Claim was not timely given to the Insurer under such Prior Policy, then such Prior Claim and any other **Claim** made during this Coverage Section's **Policy Period** which is a single **Claim** with such Prior Claim shall be considered a **Claim** first made during this Coverage Section's **Policy Period**, subject to the following conditions:

1.  no **Executive Officer** or risk manager of the **Entity** was aware of such Prior Claim prior to the expiration of the time to give notice of such Prior Claim under the Prior Policy;

2.  such Prior Claim would have been covered under the Prior Policy had notice of such Prior Claim been timely given under the Prior Policy; and

3.  written notice of such Prior Claim is given under this Policy to the Insurer no later than sixty (60) days after the earlier of: (i) the date that any **Executive Officer** or risk manager of the **Entity** became aware of such Prior Claim; or (ii) the end of the **Policy Period**.

Coverage under this Coverage Section for any Prior Claim pursuant to this Section I. C. shall only apply to **Loss** incurred after the date the Prior Claim is first noticed to the Insurer under this Coverage Section.

The maximum coverage available under this Coverage Section for any such Prior Claim and all other **Claims** which are treated as a single **Claim** with such Prior Claim shall be the lesser of the coverage then available under the Prior Policy or this Coverage Section for such **Claims**, taking into account all of the terms, conditions and exclusions of the Prior Policy and this Coverage Section, including without limitation the applicable retention and applicable limit of liability under each policy as reduced by payments of **Loss**.

AEPL-P 101 (04/18)                                          Page 1 of 6

D. Workplace Violence Coverage

1. The Insurer shall pay on behalf of the **Entity** any **Workplace Violence Expenses** incurred by the **Entity** as a result of a **Workplace Violence Incident** first occurring during the **Policy Period**, subject to (i) the respective Sublimit of Liability set forth in Item 7. B. of the Declarations, which further limits and does not increase any other applicable Limit of Liability under this Policy, and (ii) the retention amount for all **Workplace Violence Incidents** combined as set forth in Item 5. of the Declarations; provided that the Insurer shall not be liable to make any payment pursuant to this Section I. D. for:

   a. any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** based upon, arising out of, directly or indirectly resulting from, or in consequence of (i) declared or undeclared war, civil war, insurrection, riot, rebellion, revolution, governmental intervention, expropriation or nationalization, or (ii) use or threat of force or violence occurring on the **Premises**, for the purpose of demanding money, securities or property;

   b. any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** which occurs at any location other than the **Premises**; or

   c. any **Workplace Violence Expenses** incurred as a result of any demand, litigation or proceeding against any **Entity** based upon, arising out of, directly or indirectly resulting from, or in consequence of a **Workplace Violence Incident**.

2. The **Insureds** shall, as a condition precedent to coverage provided by this Section I. D., give the Insurer notice in writing of any **Workplace Violence Incident** as soon as practicable after an **Executive Officer** or risk manager of the **Entity** first learns of such **Workplace Violence Incident** but in no event later than thirty (30) days after the **Workplace Violence Incident** occurs.

## II. DEFINITIONS

When used in this Coverage Section, the following terms, whether in the singular or plural, are defined below:

A. **"Benefits"** means perquisites, fringe benefits, deferred compensation, payments for time off, or leave of absence, including but not limited to any payment (including insurance premiums) in connection with an employee benefit plan. **Benefits** also includes any other payment to or for the benefit of an **Employee** arising out of the employment relationship but shall not include salary, wages, commissions, bonuses, non-deferred cash incentive compensation or **Stock Benefits**.

B. **"Claim"** means:

   1. a written demand for monetary, non-monetary or injunctive relief against any **Insured**, or

   2. a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document, or

   3. a demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by the **Insured**, or

   4. an administrative or regulatory proceeding against any **Insured**, including a proceeding by or before the Equal Employment Opportunity Commission or a similar state or local governmental body or by the Office of Federal Contract Compliance Programs, commenced by the service upon or other receipt by the **Insured** of a notice of charges or similar document, or

   5. an administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured** of a target letter, formal investigation order or similar document, or

6.  a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by the **Insured**;

including any appeal related to any of the above.

**Claim** shall not include (i) any labor or grievance proceeding pursuant to a collective bargaining agreement, or (ii) an audit by the Office of Federal Contract Compliance Programs unless and until the **Insured** receives a Notice of Violation or Order to Show Cause or a written demand as described above in connection with such audit.

C.  "**Class Action**" means a civil proceeding against any **Insured** by or on behalf of a putative or certified class of past, present, prospective or alleged **Employees** for **Wrongful Employment Acts** or by or on behalf of **Third Parties** for **Third Party Wrongful Acts**, pursuant to Rule 23, Federal Rules of Civil Procedure, or a similar state rule of civil procedure.

D.  "**Discrimination**" means the failure to hire an applicant, the failure to promote, the demotion of, the segregation or classification of, or the employment related defamation of any **Employee** because of race, color, creed, religion, age, national origin, sex, sexual orientation or preference, gender, disability, handicap, pregnancy, obesity, marital status, veteran status, genetic information, HIV status or other protected class or characteristic established under any applicable federal, state or local statute or ordinance.

E.  "**Harassment**" means:

1.  unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made either explicitly or implicitly a term or condition of employment with the **Entity**, is used as a basis for employment decisions with the **Entity**, or creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive; or

2.  conduct of a non-sexual nature which creates a work environment that interferes with an **Employee's** performance or that is otherwise intimidating, hostile, or offensive.

F.  "**Insured**" means any past, present, or future **Employee**, the **Entity** and all its past, present and future directors, advisory directors, members of the advisory board, trustees (other than a bankruptcy or litigation trustee), governors, **Managers**, officers and their functional equivalent.

G.  "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary and noncontractual liquidated damages if insurable as provided below, back pay, front pay, damages for mental anguish or emotional distress, claimant's attorney fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents, the multiple portion of any multiplied damage award, and civil fines or penalties assessed against a natural person **Insured** for an unintentional or non-willful violation of law.

The law of the applicable jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or such fines or penalties shall control whether such amounts are insurable, provided such jurisdiction has a substantial relationship to the **Insured**, the **Entity**, or the **Claim** giving rise to such damages.

**Loss** shall not include: (i) taxes or civil or criminal fines or penalties imposed by law, other than civil fines or penalties expressly referenced above; (ii) severance pay or damages determined to be owing under an express contract of employment or an express obligation to make such payments in the event of the termination of employment, including but not limited to payments for **Stock Benefits**; (iii) **Benefits** due or that are to become due, or the equivalent value of such **Benefits**, except with respect to any **Claim** for **Wrongful Termination** of an **Employee**; (iv) the cost to provide any reasonable accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local law; (v) the cost to comply with any injunctive or other nonmonetary relief or any agreement to provide any such relief; (vi) salary, wages, commissions, bonuses, non-deferred cash incentive compensation, **Stock Benefits** or other compensation if actually or allegedly earned by the claimant in the course of employment, other than back pay, front pay or any additional

compensation allegedly due as a result of a **Wrongful Employment Act**; (vii) future salary, wages, commissions or **Benefits** of a claimant who has been hired, promoted or reinstated to employment, or shall be hired, promoted or reinstated to employment, pursuant to a settlement, order or other resolution of any **Claim**; (viii) any amount for which the **Insureds** are absolved from payment; or (ix) other matters uninsurable pursuant to the law under which this Coverage Section shall be construed, except as otherwise provided above.

H.  "**Premises**" means all properties and buildings which the **Entity** regularly occupies in conducting its business.

I.  "**Retaliation**" means unlawful or abusive retaliatory treatment against an **Employee** which results from an **Employee's** (i) exercise or attempted exercise of his or her rights under law, (ii) refusal to violate any law, (iii) opposition to any unlawful practice, (iv) disclosure or threatened disclosure to a superior or governmental authority of an alleged violation of law, (v) assisting, testifying for, or cooperating with an enforcement or governmental authority or an actual or potential claimant regarding an **Insured's** alleged or potential violation of law, or (vi) other activity which is protected by a whistleblower statute or law.

J.  "**Stock Benefits**" means:

   1.  any offering, plan or agreement between an **Entity** and any **Employee** which grants stock, stock options, warrants, or shares of the **Entity** to such **Employee**, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other incentive or compensation granted in the form of securities of the **Entity**; or

   2.  any instrument or payment whereby the value or amount of such instrument or payment is derived from the value of the **Entity's** securities, including a phantom stock plan or arrangement, or stock appreciation rights.

K.  "**Third Party**" means any natural person, other than an **Employee** or an applicant for employment with the **Entity**.

L.  "**Third Party Wrongful Act**" means actual or alleged:

   1.  discrimination by an **Insured** against a **Third Party** based on such person's race, color, creed, religion, age, national origin, sex, sexual orientation or preference, gender, disability, handicap, pregnancy or other protected class or characteristic established under any applicable federal, state or local statute or ordinance; or

   2.  harassment by an **Insured** against a **Third Party**, including, but not limited to, hostile work environment, unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature;

   provided such **Third Party Wrongful Act** is committed by an **Insured** in his or her capacity as such.

M.  "**Wage and Hour Law**" means: (i) the Fair Labor Standards Act (except the Equal Pay Act) or any similar law; and (ii) the Wage Payment and Collection Act or any other federal, state or local law, rule or regulation concerning wage and hour practices, off-the-clock work, overtime compensation, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, timely payment of wages, reimbursement of expenses, classification of employees for the purposes of determining eligibility for overtime, on-call and minimum wage compensation, meal and rest periods, and maintenance of accurate employment records.

N.  "**Workplace Violence Expenses**" means reasonable fees and expenses incurred by the **Entity** with the Insurer's prior written consent, such consent not to be unreasonably withheld, to hire:

   1.  an independent public relations or security consultant or forensic analyst for ninety (90) days;

   2.  an independent consultant to provide counseling for **Employees**; or

   3.  an independent security guard to provide security services for fifteen (15) days;

   immediately following the **Workplace Violence Incident**.

O. **"Workplace Violence Incident"** means any unlawful and intentional actual or threatened use of deadly force involving the display of a lethal weapon which occurs in or on the **Premises** and which did or could reasonably result in the death or bodily injury of any **Insured Person**.

P. **"Wrongful Act"** means:

   1. solely with respect to coverage under Insuring Clause A. Employment Practices Liability Coverage, a **Wrongful Employment Act**, and

   2. solely with respect to coverage under Insuring Clause B. Third Party Liability Coverage, a **Third Party Wrongful Act**.

Q. **"Wrongful Employment Act"** means actual or alleged:

   1. **Wrongful Termination** of an **Employee** by an **Insured**; or

   2. **Discrimination** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

   3. **Harassment** against an **Employee** or an applicant who has sought and been refused employment with the **Entity** by an **Insured**; or

   4. **Retaliation** against an **Employee** by an **Insured**; or

   5. any other violation of any federal, state or local laws concerning employment, including without limitation any failure to adopt adequate workplace or employment policies and procedures;

   provided, such **Wrongful Employment Act** is committed by an **Insured** in his or her capacity as such.

R. **"Wrongful Termination"** means the actual or constructive termination of an employment relationship in a manner which constitutes a violation of any law, a breach of an implied agreement to continue employment, or a retaliatory discharge.

# III. EXCLUSIONS

A. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured**:

   1. for any actual or alleged bodily injury (other than mental anguish or emotional distress), sickness, disease or death of any person or for damage to or destruction of any tangible property including loss of use of any damaged or destroyed tangible property; or

   2. for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**, any Social Security, worker's compensation, disability benefits, or unemployment compensation law, any **Wage and Hour Law**, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, rules or regulations promulgated under and amendments to any such law, or similar provisions of any federal, state or local statutory law or common law; however, this Exclusion shall not apply to any **Claim** for actual or alleged **Wrongful Termination** or **Retaliation** on account of the claimant's exercise of rights pursuant to any such law, rule or regulation.

B. The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:

   1. a lockout, strike, picket line, replacement or any similar actions in connection with labor disputes or labor negotiations; or

2.  any litigation, proceeding or investigation against any **Insured** pending on or before the Pending or Prior Date for this Coverage Section set forth in Item 5. of the Declarations, or the same or substantially the same fact, circumstance, situation, event or **Wrongful Act** underlying or alleged therein; or

3.  any **Wrongful Act**, fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given and accepted under any prior policy or coverage section for employment practices or similar insurance.

No **Wrongful Act** of any natural person **Insured** will be imputed to any other natural person **Insured** to determine the applicability of the foregoing Exclusions.

Insured

# Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **03/25/2021**

To be attached to and form part of
Policy No. **EPG0026852**

Issued to: **United Talent Agency Holdings Inc**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## VIOLATION OF EMPLOYEE PRIVACY EXPENSES SUBLIMIT

It is hereby understood and agreed that:

1. The Insurer will reimburse the **Entity** for **Violation of Employee Privacy Expenses** incurred by the **Entity** in connection with a **Violation of Employee Privacy** that takes place during the **Policy Period**.

2. Section II., DEFINITIONS, of this Coverage Section is amended to add the following:

    "**Record**" means an **Employee's** first name or first initial, and last name, in combination with:

    1. their social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

    2. their financial account number (including a bank account number, retirement account number, or healthcare spending account number);

    3. their credit, debit or other payment card number; or

    4. any individually identifiable health information, as described in the Health Insurance Portability and Accountability Act of 1996, held by the **Entity** to the extent any such information is intended by the **Entity** to be accessible only by persons or organizations specifically authorized by the **Entity** to have access to such information.

    "**Violation of Employee Privacy**" means an **Entity's** actual or alleged failure to:

    1. secure a **Record** from actual or potential unauthorized access by another person or organization which results in injury to such **Employee**; or

    2. provide notice, as required by any state, federal or local statutory law or common law anywhere in the world, to an **Employee** whose **Record** was accessed or may have been accessed by an unauthorized person or organization.

    "**Violation of Employee Privacy Expense**" means the reasonable and necessary fees and expenses (including without limitation attorneys' fees and experts' fees) incurred by the **Entity** in connection with a **Violation of Employee Privacy**.

    **Violation of Employee Privacy Expense** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, trustees, officers or **Employees**.

3. The Insurer's maximum liability for all **Violation of Employee Privacy Expenses** shall be $50,000 , which amount shall be part of, and not in addition to, the Insurer's Aggregate Limit of Liability as stated in Item 5. B. of the Declarations Page.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer:   **RLI Insurance Company**

Effective date of
this endorsement:   **03/25/2021**

To be attached to and form part of
Policy No.   **EPG0026852**

Issued to:   **United Talent Agency Holdings Inc**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## IMMIGRATION CLAIM SUBLIMIT ENDORSEMENT

It is hereby understood and agreed that:

1.  Section I. INSURING CLAUSES, of this Coverage Section is amended to add the following:

    "The Insurer will pay on behalf of the **Insureds**, **Loss** which the **Insureds** are legally obligated to pay as a result of an **Immigration Claim** first made against the **Insureds** during the **Policy Period**, or during the Discovery Period (if purchased), against an **Insured** by or on behalf of a past, present or prospective **Employee** for an **Immigration Wrongful Act**."

2.  Section II. DEFINITIONS, of this Coverage Section is amended to add the following:

    "**Immigration Claim**" means any criminal investigation of any of the **Insureds** by any governmental agency for actually or allegedly hiring or harboring illegal aliens.

    "**Immigration Wrongful Act**" means any actual or alleged violation(s) of the Immigration Control Act of 1986 or any other similar federal or state laws or regulations.

3.  The Insurer's maximum liability for all **Immigration Claims** shall be $ 50,000              , which amount shall be part of, and not in addition to, the Insurer's Aggregate Limit of Liability as stated in Item 5. B. of the Declarations Page.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Insured

# Asset Protection Policy

Coverage: **Employment Practices Liability**

Insurer: **RLI Insurance Company**

Effective date of
this endorsement: **03/25/2021**

To be attached to and form part of
Policy No. **EPG0026852**

Issued to: **United Talent Agency Holdings Inc**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF HARASSMENT – WORKPLACE BULLYING

It is hereby understood and agreed that the definition of "**Harassment**" in Section II. DEFINITIONS, of this Coverage
Section is deleted in its entirety and replaced with the following:

"**Harassment**" means:

1. unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature,
   including workplace bullying, that is made either explicitly or implicitly a term or condition of employment with the
   **Entity**, is used as a basis for employment decisions with the **Entity**, or creates a work environment that interferes with
   an **Employee's** performance or that is otherwise intimidating, hostile, or offensive; or

2. conduct of a non-sexual nature, including workplace bullying, which creates a work environment that interferes with an
   **Employee's** performance or that is otherwise intimidating, hostile, or offensive.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

AEPL 607 (04/18)

Page 1 of 1

Insured

Policy Number: EPG0026852

RLI Insurance Company

# ASSET PROTECTION POLICY

## Management and Company Liability
## Coverage Section

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the Application forming a part hereof and its attachments and the material incorporated therein, RLI Insurance Company, herein called the "Insurer," and the Insureds agree as follows:

## I. INSURING CLAUSES

A. Insured Person Liability Coverage

The Insurer will pay on behalf of the **Insured Persons**, **Loss** incurred by the **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**, except for **Loss** which the **Entity** pays to or on behalf of the **Insured Persons** as indemnification.

B. Company Reimbursement Coverage

The Insurer will pay on behalf of the **Entity**, **Loss** incurred by the **Insured Persons** as a result of **Claims** first made against the **Insured Persons** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**, if the **Entity** grants indemnification to or on behalf of the **Insured Persons** for such **Loss**.

C. Company Liability Coverage

The Insurer will pay on behalf of the **Entity**, **Loss** incurred by the **Entity** as a result of **Claims** first made against the **Entity** during the **Policy Period**, or during the Discovery Period (if purchased), for **Wrongful Acts**.

## II. ADDITIONAL COVERAGES

A. Demand Investigation and Books and Records Costs Coverage

The Insurer will pay on behalf of the **Entity**, **Investigative Costs** which the **Entity** is legally obligated to pay in response to any **Shareholder Derivative Demand**, and **Books and Records Costs** which the **Entity** is legally obligated to pay in response to any **Books and Records Request**, first received during the **Policy Period**, or during the Discovery Period (if purchased). The maximum aggregate liability of the Insurer under this Coverage Section for all **Investigative Costs** and all **Books and Records Costs** shall be the respective Sublimit of Liability as stated in Item 7. of the Declarations. These sublimits further limit and do not increase any other applicable Limit of Liability under this Policy.

B. Pre-Claim Inquiry Coverage

The Insurer will pay under Insuring Clauses A. and B. **Defense Expenses** incurred by the **Insured Persons** for a **Pre-Claim Inquiry** if (i) such **Pre-Claim Inquiry** is first made during the **Policy Period**, (ii) the **Insureds** in their sole discretion give written notice of the **Pre-Claim Inquiry** to the Insurer, and (iii) such **Defense Expenses** are incurred after the date such written notice is given to the Insurer.

C.  Additional Side A Limit of Liability for Insured Persons

If the Additional Side A Limit for **Insured Persons** is purchased pursuant to Item 6. A. of the Declarations and if the applicable Limit of Liability under this Coverage Section is exhausted, an Additional Limit of Liability in the amount stated in Item 6. A. of the Declarations shall apply solely for **Loss** covered under Insuring Clause A., Insured Person Liability Coverage; provided such Additional Side A Limit of Liability shall not apply with respect to any **Claim** for a **Wrongful Employment Act**. Such Additional Limit of Liability is in addition to and not part of any other applicable Limit of Liability under this Policy, and shall be excess of any amounts payable under all other insurance policies that are specifically excess of this Coverage Section. Liability under such Additional Side A Limit of Liability shall attach to the Insurer only after such excess insurers, the **Insureds**, and/or any other source shall have paid in legal currency as **Loss** the full amount of the excess policies' limits of liability.

D.  Executive Protection Coverage

1.  The Insurer shall pay on behalf of a **Protected Executive** all reasonable fees and expenses incurred by the **Protected Executive** in connection with using a public relations firm to mitigate the adverse effects to the reputation of the **Protected Executive** from a **Claim** against the **Protected Executive** which is covered under this Coverage Section, including without limitation from any negative public statement regarding the **Protected Executive** by a **Regulatory Body** relating to such **Claim** or the **Wrongful Acts** alleged therein; provided (i) the Insurer's maximum liability for all such fees and expenses incurred by all **Protected Executives** combined shall be the Reputational Protection Costs Sublimit of Liability set forth in Item 7. A. of the Declarations, and (ii) this Paragraph only applies to the extent such fees and expenses are not otherwise covered under this Coverage Section.

2.  The Insurer shall pay on behalf of a **Protected Executive** all reasonable fees and expenses incurred by the **Protected Executive** to oppose any efforts by a claimant in a **Claim** to seize or otherwise enjoin the personal assets or real property of the **Protected Executive** in connection with a **Claim** covered under this Coverage Section, or to revoke, overturn or set aside a court order in connection with a **Claim** covered under this Coverage Section which impairs the use of such assets or property; provided (i) the Insurer's maximum liability for all such fees and expenses incurred by all **Protected Executives** combined shall be the Asset Protection Costs Sublimit of Liability set forth in Item 7. A of the Declarations, and (ii) this Paragraph only applies to the extent such fees and expenses are not otherwise covered under this Coverage Section.

## III. DEFINITIONS

When used in this Coverage Section, the following terms, whether in the singular or plural, are defined below:

A.  "**Books and Records Costs**" means any reasonable fees and expenses incurred by the **Entity** in response to a **Books and Records Request**, other than wages, salaries, fees, benefits or overhead expenses associated with any **Insured**.

B.  "**Books and Records Request**" means any written request submitted by or on behalf of a shareholder of the **Entity** to the **Entity** or its Board of Directors to inspect the books and records of such **Entity** pursuant to Section 220 of the Delaware General Corporation Law or other similar statute.

C.  "**Claim**" means:

1.  a written demand for monetary, non-monetary or injunctive relief against any **Insured**; or

2.  a civil or criminal proceeding against any **Insured** commenced by the service of a complaint or similar pleading or the return of an indictment, information or similar charging document; or

3.  a formal administrative or regulatory proceeding against any **Insured Person**, or against the **Entity** but only while such proceeding is also pending against an **Insured Person**, commenced by the filing of a notice of charges, formal investigative order or similar document; or

4.  a formal or informal civil, criminal, administrative or regulatory investigation against any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a written notice or subpoena from the investigating authority identifying such **Insured Person** as an individual against whom a formal proceeding may be commenced, including without limitation a Wells notice or target letter (subject to Title 9, §11.151 of the U.S. Attorney's Manual); or

5.  a written request received by an **Insured** to toll or waive a statute of limitations relating to a **Wrongful Act** by an **Insured**; or

6.  an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**; or

7.  any demand for arbitration or mediation received by any **Insured** relating to a **Wrongful Act** by an **Insured**; or

8.  solely with respect to coverage under Section II. A., a **Shareholder Derivative Demand** or **Books and Records Request**; or

9.  solely with respect to coverage under Section II. B, a **Pre-Claim Inquiry**,

including any appeal related to any of the above.

D.  "**Controlling Person**" means an **Insured Person** who allegedly controls the **Entity** through stock ownership or pursuant to an agreement, including any such **Insured Person** described in Section 15 of the Securities Act of 1933, Section 20 of the Securities Exchange Act of 1934, or any similar federal, state or local rule or regulation.

E.  "**Insured**" means the **Entity** and **Insured Person** collectively or individually.

F.  "**Insured Person**" means any natural person who has been, now is or shall become (i) a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, officer, **Manager**, advisory director or member of the advisory board of the **Entity**, in-house counsel, risk manager, controller, or their functional equivalent, and (ii) an **Employee** who is not described in subpart (i) above, provided such **Employee** shall not be considered an **Insured Person** for purposes of the definition of **Outside Position** or Exclusion 4. in Section IV. B. below.

G.  "**Investigative Costs**" means reasonable fees and expenses (including but not limited to attorneys fees and experts fees) incurred by the **Entity** (including its Board of Directors or equivalent management body or any committee thereof) to investigate or evaluate on behalf of the **Entity** whether it is in the best interest of the **Entity** to prosecute the claims alleged in a **Shareholder Derivative Demand**, after notice of the **Shareholder Derivative Demand** is given to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of the General Terms and Conditions. **Investigative Costs** shall not include the **Entity's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or **Employees**.

H.  "**Loss**" means monetary amounts the **Insureds** are legally obligated to pay as a result of a covered **Claim**, including but not limited to monetary damages, judgments, settlements, pre- and post-judgment interest with respect to covered damages, punitive, exemplary or the multiple portion of multiplied damages where insurable under applicable law, **Defense Expenses**, claimant's attorney's fees and costs for which an **Insured** against whom the **Claim** is made is legally obligated to pay by reason of a court order or settlement agreement to which the Insurer consents, taxes imposed on an **Entity** for which an **Insured Person** is legally obligated to pay solely by reason of the **Entity's Financial Impairment**, civil fines or penalties assessed against an **Insured Person** for an unintentional or non-willful violation of any federal, state, local or foreign law, including without limitation any such violation of the Foreign Corrupt Practices Act (FCPA).

Solely with respect to coverage pursuant to the following subsections of this Coverage Section, **Loss** means the following respective amounts:

Section II. A. **Investigative Costs** and **Books and Records Costs**

Section II. D. Reputational Costs and Asset Protection Costs, as described therein

The law of the applicable jurisdiction most favorable to the insurability of punitive, exemplary or multiple damages or such fines or penalties shall control whether such amounts are insurable, provided such jurisdiction has a substantial relationship to the **Insured**, the **Entity**, or the **Claim** giving rise to such damages.

**Loss** shall not include taxes, civil or criminal fines or penalties imposed by law other than the taxes, civil fines or penalties described above, any amount for which the **Insureds** are absolved from payment, any amount allocated to uncovered loss pursuant to Section V. of the General Terms and Conditions, the cost to comply with any injunctive or other non-monetary relief or any agreement to provide such relief, any amount which represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by the **Entity** in connection with the purchase of any securities or assets except to the extent the **Insured Persons** are legally liable for such amount and the **Entity** is not legally permitted to or is not financially able to indemnify the **Insured Persons** for such amount, or matters which are uninsurable under the law pursuant to which this Policy shall be construed, except as otherwise provided above.

I.  "Outside Entity" means:

1.  any not-for-profit entity that is exempt from federal taxation under the Internal Revenue Code of 1986, as amended; or

2.  any other entity that is specifically scheduled as an **Outside Entity** by endorsement to this Coverage Section.

J.  "Outside Position" means service by an **Insured Person** as a director, officer, trustee, regent or governor of an **Outside Entity**, but only while such service is rendered with the knowledge and consent of or as part of the duties regularly assigned to the **Insured Person** by the **Entity**.

K.  "Pre-Claim Inquiry" means (1) any request, demand or subpoena by a **Regulatory Body** to interview or depose an **Insured Person** or for production of documents by an **Insured Person**, in his or her capacity as such; or (2) any request, demand or subpoena by the **Entity** (including its board of directors or any committee of the board of directors) to interview or depose an **Insured Person** or for production of documents by an **Insured Person**, but only if such request, demand or subpoena by the **Entity** arises out of an inquiry or investigation by a **Regulatory Body**; provided that such **Pre-Claim Inquiry** shall be deemed to have been made when the **Insured Person** first receives such request, demand or subpoena. The Insurer shall not be liable for any **Defense Expenses** as a result of any such **Pre-Claim Inquiry** which are incurred (a) prior to the date the **Insured** gives notice of such **Pre-Claim Inquiry** to the Insurer pursuant to Section IV. NOTICE AND CLAIM REPORTING PROVISIONS, of the General Terms and Conditions, or (b) in connection with any routine or regularly scheduled oversight, compliance, audit or inspection activities by a **Regulatory Body** or the **Entity**.

L.  "Professional Services" means services which are performed by or on behalf of an **Insured** for others in connection with the **Entity's** business, regardless of whether or not such services are compensated or uncompensated.

M.  "Protected Executive" means any natural person who has been, now is or shall become a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, officer, **Manager**, advisory director or member of the advisory board of the **Entity**, in-house counsel, risk manager, controller, or their functional equivalent.

N.  "Regulatory Body" means any federal, state or local law enforcement or government authority (including but not limited to the U.S. Department of Justice, U.S. Securities and Exchange Commission, and any federal or state attorney general) or the enforcement unit of any securities exchange or similar self-regulatory organization.

O.  "**Selling Shareholder**" means an **Insured Person** in his or her capacity as an attempted or actual seller of securities issued by the **Entity**.

P.  "**Shareholder Derivative Demand**" means any written demand by one or more shareholders of the **Entity** upon the board of directors (or equivalent management body) of the **Entity** to bring a civil proceeding on behalf of the **Entity** in a court of law against any **Insured Person** for a **Wrongful Act**.

Q.  "**Wrongful Act**" means:

1.  any actual or alleged error, omission, act, misstatement, misleading statement, or breach of duty by the **Entity** or an **Insured Person** individually or otherwise, in his or her capacity as such or as a **Controlling Person** or **Selling Shareholder** or in an **Outside Position**; or

2.  any matter claimed against an **Insured Person** solely by reason of his or her status as an **Insured Person**, **Controlling Person** or **Selling Shareholder**.

## IV. EXCLUSIONS

A.  The Insurer shall not be liable for **Loss** (except for **Defense Expenses**) on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of:

1.  such **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** is not legally entitled if a non-appealable judgment or final adjudication in the underlying proceeding adverse to such **Insured** establishes that such **Insured** gained such profit, remuneration or advantage; or

2.  such **Insured** committing any deliberately fraudulent **Wrongful Act** or any willful violation of law if a non-appealable judgment or final adjudication in the underlying proceeding adverse to such **Insured** establishes that such **Insured** committed such **Wrongful Act** or willful violation.

B.  The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured**:

1.  for any actual or alleged bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use of damaged or destroyed tangible property;

2.  for any actual or alleged violation of **ERISA**;

3.  for any actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or disposal of **Pollutants** into or on real or personal property, water or the atmosphere; or any direction or request that the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so; including but not limited to any **Claim** for financial loss to the **Entity** based upon, arising out of, directly or indirectly resulting from or in consequence of the matters described in this Exclusion; however, this Exclusion will not apply to any **Claim** against any **Insured Person** for **Loss** covered under Insuring Clause A., Insured Person Liability Coverage;

4.  by or on behalf of, or in the name or right of, any **Entity** or, with respect to **Outside Position** coverage, the **Outside Entity**, or any director, trustee, governor, officer or **Manager** of the **Entity** or the **Outside Entity** in any capacity; however, this Exclusion will not apply to any **Claim**:

a.  that is a shareholder derivative action brought and maintained on behalf of, or in the name or right of, the **Entity** or **Outside Entity** without any active assistance or participation of, or solicitation by, any **Insured Person** (other than assistance, participation or solicitation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of an applicable federal, state, local or foreign law, affords protection to such **Insured Person**);

b.  in the form of a cross-claim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Coverage Section;

c.  brought or maintained on behalf of the **Entity** or **Outside Entity** by any receiver, conservator, liquidator, trustee, examiner, rehabilitator, creditors committee or similar official appointed to take control of, supervise, manage, or liquidate the **Entity** or **Outside Entity**, or any assignee of any such receiver, conservator, liquidator, trustee, examiner, rehabilitator, creditors committee or similar official;

d.  brought or maintained by a director, trustee, governor, officer or **Manager** of the **Entity** or **Outside Entity** who has not served in such capacity for a period of at least one (1) year prior to the date such **Claim** was first made and who brings and maintains such **Claim** independently of, and without the active assistance, participation, or solicitation of the **Entity** or **Outside Entity** or any other director, trustee, governor, officer or **Manager** who is serving or has served as a director, trustee, governor, officer or **Manager** of the **Entity** or **Outside Entity** within such one (1) year period; or

e.  brought and maintained outside of the United States, Canada or any other common law country (including any territories thereof);

5.  for any **Wrongful Employment Act**, or any actual or alleged violation of any social security, worker's compensation, disability benefits, or unemployment compensation law, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, rules or regulations promulgated under and amendments to any such law, or similar provisions of any federal, state or local statutory law or common law; or

6.  for any actual or alleged emotional distress, mental anguish, outrage, humiliation, false arrest or imprisonment, abuse of process, malicious prosecution, defamation, violation or invasion of any right of privacy or private occupancy, trespass, nuisance, or wrongful entry or eviction; however, this Exclusion B. 6. shall not apply to **Loss** for any mental anguish or emotional distress when alleged as part of an otherwise covered **Claim**.

C.  The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, or in consequence of:

1.  the service by any **Insured Person** as a director, officer or employee of any organization other than the **Entity** or an **Outside Entity**, even if directed or requested by the **Entity** to serve as a director, officer or employee of such other organization;

2.  any litigation, investigation, or administrative or regulatory proceeding against any **Insured** pending on or before the respective Pending or Prior Date for this Coverage Section set forth in Item 5. of the Declarations, or the same or substantially the same actual or alleged fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged therein;

3.  any fact, circumstance, situation, transaction, event or **Wrongful Act** which was the subject of any notice given and accepted under any prior policy or coverage section for directors and officers liability or other similar professional liability insurance;

4.  any actual, attempted or proposed offering, solicitation, sale, purchase, distribution, or issuance of debt or equity securities by the **Entity** or any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities and Exchange Commission promulgated thereunder, any other federal, state, local or provincial statute or common law relating to securities, or any rules or regulations promulgated thereunder, all as amended; however this Exclusion C. 4. shall not apply with respect to any:

a.  offering, solicitation, sale, distribution, or issuance of securities in a transaction that is exempt from registration under the Securities Act of 1933, as amended (other than an exemption pursuant to Title IV of the Jumpstart Our Business Startups Act ("JOBS Act"), or any applicable similar foreign law that regulates the purchase, sale or offering of securities; or

    b. **Claim** made by a securities holder of the **Entity** for failure of the **Entity** to undertake or complete an initial public offering or sale of securities of the **Entity**; or

    c. **Wrongful Act** relating to the **Entity's** preparation for any proposed public offering of securities, including, but not limited to, a road show as defined in Securities Act Rule 433(h)(4), if such offering does not occur; or

5. the rendering of, or actual or alleged failure to render, any **Professional Services**, provided that this Exclusion C. 5. shall not apply to **Claims** brought by a securityholder of the **Entity** in their capacity as such without any active assistance or participation of, or solicitation by, any **Insured**.

D. The Insurer shall not be liable under Insuring Clause C., Company Liability Coverage, for **Loss** on account of that portion of any **Claim** made against any **Entity** based upon, arising out of, directly or indirectly resulting from or in consequence of:

1. any actual or alleged: price fixing (including without limitation horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment); restraint of trade; monopolization; or violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1935, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provisions of any federal, state, local or foreign statutory or common law;

2. any actual or alleged infringement, piracy, misappropriation, disclosure or slander of title of any actual, alleged or prospective copyright, patent, service mark, trade name, trademark, licensing right, ideas or trade secrets;

3. any actual or alleged obligation of such **Entity** pursuant to any workers' compensation, unemployment insurance, social security, disability benefits, or similar law; or

4. any actual or alleged obligation under or breach of any written, oral, express, or implied contract or agreement except to the extent that such **Entity** would have been liable in the absence of such contract or agreement.

To determine the applicability of any Exclusions in Sections IV. A., B., C. or D. above: (i) no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person**, and (ii) only **Wrongful Acts** of an **Executive Officer** will be imputed to the **Entity**.

## V. OUTSIDE POSITION COVERAGE

All coverage under this Coverage Section for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions** will be specifically excess of any indemnification or other valid and collectible insurance provided to such **Insured Person** by the **Outside Entity** for which the **Insured Person** serves in his or her **Outside Position**.

## VI. SECURITIES TRANSACTIONS

If the **Entity** intends to sell or offer to sell securities during the **Policy Period** that are required to be registered under the Securities Act of 1933 or that are exempt from such registration by reason of Title IV of the JOBS Act, the **Entity** shall provide the Insurer written notice of the proposed sale or offering not later than thirty (30) days prior to the effective date of such sale or offering, along with all information requested by the Insurer relating to such sale or offering. The Insurer shall provide a quotation to the **Entity** for the deletion of Exclusion C. 4. in Section IV. above with respect to such sale or offering, provided that such quotation shall be subject to such other terms, conditions and limitations of coverage and such additional premium as the Insurer, in its sole discretion, may require.

Insured

# Asset Protection Policy

Coverage: **Management and Company Liability**

Insurer:  **RLI Insurance Company**

Effective date of
this endorsement:  **03/25/2021**

To be attached to and form part of
Policy No.  **EPG0026852**

Issued to:  **United Talent Agency Holdings Inc**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED ENDORSEMENT

It is hereby understood and agreed that the definition of "**Insured(s)**" in Section III. E., DEFINITIONS, of this Coverage
Section, is amended by adding the following:

Dear Media, LLC
UTA Brant Advisor, LP
UTA Brant Management, LLC
UTA Raze Holdings, LLC
UTA Radcliff Holdings, LLC

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

APDO 602 (04/18)

Page 1 of 1

Insured

# Asset Protection Policy

Coverage Section: **Management and Company Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT EXCLUSION

It is hereby understood and agreed that Subsection IV. D. of this coverage section is amended by adding the following:

<u>5.</u>    any actual or alleged infringement, piracy, misappropriation, disclosure, or slander of title of any actual, alleged or prospective intellectual property rights, including any actual, alleged or prospective copyright, patent, service mark, trade name, trademark, licensing right, ideas or trade secrets.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### PUBLISHING AND BROADCASTING LIABILITY EXCLUSION

It is hereby understood and agreed that:

1.  Section III., DEFINITIONS, of this coverage section is amended by adding the following:

    R.   "**Publishing and Broadcasting Services**" means: the recommendation of materials concerning the interests, activities, operations, products, or services of clients to be uttered, disseminated, published, distributed, broadcast or advertised;

2.  Section IV. C., EXCLUSIONS, of this coverage section is amended by adding the following:

    5.   any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted or allegedly committed or attempted in connection with the rendering of, or actual or alleged failure to render, any **Publishing and Broadcasting Services** for others by any person or entity.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**        Insurer:  **RLI Insurance Company**

Effective date of                                           To be attached to and form part of
this Endorsement: **03/25/2021**                            Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND SECTION IV. EXCLUSIONS C. 5.

It is hereby understood and agreed that Section IV. C., 5., EXCLUSIONS, is deleted in its entirety and replaced with the following:

5.  based upon, arising out of, directly or indirectly resulting from, or in consequence of the rendering of, or actual or alleged failure to render, any **Professional Services**, provided that this Exclusion C. 5. shall not apply to **Claims** brought by a securityholder of the **Entity** in their capacity as such without any active assistance or participation of, or solicitation by, any **Insured**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**        Insurer: **RLI Insurance Company**

Effective date of                                          To be attached to and form part of
this Endorsement: **03/25/2021**                           Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**ANTITRUST SUBLIMIT, COINSURANCE AND SEPARATE RETENTION ENDORSEMENT**

1.  It is hereby understood and agreed that Subsection IV. D. 1. of this coverage section is deleted in its entirety.

2.  When used in this endorsement:
    **"Antitrust Violation"** means any actual or alleged: price fixing (including without limitation horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment); restraint of trade; monopolization; or violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1935, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provisions of any federal, state, local or foreign statutory or common law.

3.  Maximum Sublimit:
    Subject to the coinsurance provision set forth in paragraph 4. of this endorsement, the Insurer's maximum limit of liability for all **Loss**, including **Defense Expenses**, resulting from all **Claims** based on, arising out of, directly or indirectly resulting from, or in any way involving any **Antitrust Violation** shall be $5,000,000, which amount shall be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability set forth in Item 5. A. of the Declarations.

4.  Coinsurance:
    Solely with respect to covered **Loss**, including **Defense Expenses**, resulting from any **Claim** based on, arising out of, directly or indirectly resulting from, or in any way involving any **Antitrust Violation**, the **Insureds** shall bear uninsured and at their own risk 0% of such **Loss**, including **Defense Expenses**, which is excess of the applicable Retention, and the Insurer's liability shall apply only to the remaining 0% of such **Loss**, including **Defense Expenses**, in excess of the applicable Retention, subject to the limit of liability set forth in paragraph 5. A. of this Endorsement.

5.  Retention:
    Solely with respect to **Claims** based on, arising out of, directly or indirectly resulting from, or in any way involving any **Antitrust Violation**, Item 5. A. of the Declarations is amended to read in its entirety as follows:

"Item 5. A. Antitrust Retentions:

    (a) $0_____ each **Insured Person** each **Claim** under Insuring Clause 1.

    (b) $250,000_____ each **Claim** under Insuring Clause 2.

    (c) $250,000____ each **Claim** under Insuring Clause 3."

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**          Insurer: **RLI Insurance Company**

Effective date of                                                To be attached to and form part of
this Endorsement: **03/25/2021**                                 Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NETWORK SECURITY AND PRIVACY EXCLUSION

It is hereby understood and agreed:

1.  Section III., DEFINITIONS, of this coverage section is amended to include the following:

    "**Breach Notice Law**" means any federal, state, local or foreign privacy legislation, regulation, or their functional equivalent that requires an **Entity** to provide notice to affected natural persons of any actual or potential unauthorized access to, acquisition of or misuse of their **Confidential Records**.

    "**Computer**" means a device or group of hardware devices on which software, applications, firmware, script, code and other computer programs containing **Data** can be operated and viewed.

    "**Confidential Record**" means a natural person's first name or first initial and last name in combination with:

    1.  non-public personally identifiable information, as defined in applicable federal, state, local or foreign legislation or regulations including, but not limited to, social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

    2.  financial account number (including a bank account number, retirement account number or healthcare spending account number);

    3.  credit, debit or payment card numbers or information, including any required security code, access code, username or password that would permit access to an individual's credit, debit or payment account;

    4.  information related to employment by an **Insured**;

    5.  individually identifiable information considered nonpublic personal information pursuant to the Gramm-Leach Bliley Act of 1999, as amended and its implementing regulations; or

    6.  individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended and its implementing regulations, including but not limited to the Health Information Technology for Economic and Clinical Health Act (HITECH Act) part of the American Recovery and Reinvestment Act of 2009 (ARRA);

which is owned by an **Insured** or a third party for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities that have been specifically authorized by the **Insured** to have such access.

"**Cyber Attack**" means the transmission of fraudulent or unauthorized **Data** that is intended to and successfully modifies, alters, encrypts, damages, destroys, deletes, records, transmits, acquires or consumes information within a **System** without authorization, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

"**Data**" means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information, irrespective of the way it is used and rendered.

"**Media**" means electronic applications, software, scripts and programs on which **Data** is stored so that it can be collected, read, retrieved, or processed by a **Computer**. **Media** does not mean paper, or other tangible property, money, debt, equity, instruments, accounts, bonds, bills, records, abstracts, deeds or manuscripts.

"**System**" means any **Computer**, **Media**, website, and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are owned by, proprietary to, licensed to, leased to, or operated by or on behalf of an **Insured**.

2. Section IV., EXCLUSIONS, of this coverage section is amended to include the following:

The Insurer shall not be liable for **Loss** on account of that portion of any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of the:

E. failure or violation of the security of a **System**, including, but not limited to, impaired or denial of access, phishing or other social engineering attack, a **Cyber Attack**, or any act or failure to act of an **Insured** or employee of an **Insured** that results in the failure or violation of the security of a **System**;

F. giving or surrendering of money, securities or other property, whether or not fraudulent, by following written or electronic instructions to send money, securities or other property;

G. failure to protect **Confidential Records** or other confidential information, trade secrets, processing methods, customer lists, or other proprietary information;

H. theft, loss, disclosure, or misappropriation of hardware, **Media**, or **System** output or other documents on which **Data** is stored or recorded, that is controlled by or on behalf of an **Insured**;

I. failure to disclose an event referenced in E. through H. above in violation of any **Breach Notice Law**; or

J. violation of any other federal, state, foreign or local privacy statute or regulation in connection with any event referenced in E. through I. above, including any consumer protection or unfair and deceptive trade practice law enforced by state Attorneys General or the Federal Trade Commission, including but not limited to Section 5(a) of the Federal Trade Commission Act, 15. U.S.C § 45 (a), as amended;

K. violation of an **Insured's** policies or procedure in connection with any event referenced in E. through J. above.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**          Insurer: **RLI Insurance Company**

Effective date of                                               To be attached to and form part of
this Endorsement: **03/25/2021**                                Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FALSE ADVERTISING EXCLUSION

It is hereby understood and agreed that Section IV. C., EXCLUSIONS, of this coverage section is amended by adding the following:

6.  any false advertising, misrepresentation in advertising or unfair or deceptive trade practices, with respect to the advertising of the **Insured's** own goods, publications or services; provided that this Exclusion shall not apply to **Loss** on account of any securities **Claim**, securityholder derivative demand or securityholder derivative action that is otherwise covered under this coverage section.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# Asset Protection Policy

Coverage Section: **Management and Company Liability**

Insurer: **RLI Insurance Company**

Effective date of
this Endorsement: **03/25/2021**

To be attached to and form part of
Policy No.: **EPG0026852**

Issued to: **United Talent Agency Holdings, Inc.**

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FOR-PROFIT ODL EXTENSION

1. It is hereby understood and agreed that the definition of "**Outside Entity**" in Section III., DEFINITIONS, of this Coverage Section is amended to include the following for-profit entity(ies) (each a "**For-Profit Outside Entity**"):

   Plantopioa Global ULC (BC)

2. Solely with respect to an **Insured Person** serving in an **Outside Position** with a **For-Profit Outside Entity**, the Insurer shall not be liable to make any payment under this Policy for **Loss** resulting from any **Claim** made against an **Insured Person** for, based upon, arising from or in any way related to any pending or prior litigation against or involving an **Insured Person** which was pending on or existed prior to <u>May 16, 2020</u>, or any **Claim** in whole or in part arising from the same or substantially the same facts, circumstance or allegations which are the subject of or basis for such pending or prior litigation.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

# EXHIBIT B

Case 2:24-cv-07540-ODW-E   Document 1-1   Filed 09/04/24   Page 90 of 118   Page ID #:93

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

EXCEL SPORTS MANAGEMENT, LLC

              Plaintiff,

        v.

ERIC EWAYS and KLUTCH SPORTS GROUP,
LLC,

              Defendants.

Index No. ___

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Excel Sports Management, LLC ("Excel" or "Plaintiff"), by and through its

attorneys, Sheppard, Mullin, Richter & Hampton, LLP, for their Complaint, allege against

Defendants Eric Eways ("Eways") and Klutch Sports Group, LLC ("Klutch") (together,

"Defendants") as follows:

## NATURE OF THE ACTION

1.     This action is necessary to remedy the litany of harms and damages caused by the

departure of Excel's most senior executive responsible for sourcing and securing lucrative, brand-

building off-court marketing deals for the roster of professional basketball players Excel represents

in violation of his non-compete agreement and his confidentiality and fiduciary obligations to

Excel at the inducement of, and with the assistance of, Klutch. The actions of Eways and Klutch,

independently and/or together, give rise to claims for breach of contract, breach of the duty of

loyalty and fiduciary duty, tortious interference with contract, tortious interference with economic

relations, and unfair competition.

2.     Excel and Klutch are fierce competitors in the niche sports management and

marketing industry vying for the opportunity to represent professional athletes with regard to their

on-court team contracts, as well as off-court marketing and other opportunities.

-1-

3.      Excel has staked out its position as an industry and global leader in this field, providing best in class services to its athlete clients based upon 20 years' of investment in developing relationships with athletes and brand partners that provide opportunities for athletes, developing unique and confidential business and marketing strategies that provide it with a competitive advantage, and developing a sterling reputation that is the envy of the industry.

4.      Excel hired Eways in January 2018 and developed him into a unique and valuable asset, entrusted with leading Excel's efforts to secure off-court marketing opportunities for its athlete clients, by sharing its relationships and confidential information with him, and otherwise allowing him to trade on Excel's name and its unparalleled roster of athletic talent. The role that Eways occupied is critical for a sports agency, as represented athletes expect their agencies to provide them with marketing opportunities, which are invaluable in satisfying represented athletes and attracting new athletes seeking representation.

5.      In exchange for Excel's willingness to develop Eways into a senior executive with this scope of responsibility, Excel asked, and Eways agreed, to: (i) protect its confidential information and relationships; and (ii) not compete with Excel for a period of just eight months following the termination of his employment, which Excel believed would alleviate his ability to cause the harms described herein.

6.      Klutch has been in the sports management and marketing industry for only half as long as Excel. While a competitor to Excel, its current roster of talent, suite of services, and operational capabilities are inferior to Excel's in every respect.

7.      Rather than devote the time and resources to develop an unseasoned candidate, as Excel had done with Eways, Klutch elected to capitalize on Excel's investment in Eways, the relationships it employed him to develop, and the confidential information it provided to him to

allow him to succeed, by inducing Eways to breach his obligations to Excel by accepting competitive employment to provide similar, if not the same, services as he provided at Excel.

8.      Thus, with Klutch's assistance, Eways has violated his reasonable and narrowly tailored non-compete agreement and confidentiality obligations and threatened a cavalcade of Excel's legitimate business interests, including, but not limited to: (i) its investment in the development of Eways' unique and specialized services; (ii) its brand partner relationships, and the critical off-court marketing opportunities they provide to Excel and its athlete clients; and (iii) its confidential business information that provides it with the competitive advantage that has allowed it to rise to the top of the industry.

9.      Klutch would not have hired Eways but for his ability to assist it in bringing these harms to fruition. It is these harms that will allow it to gain an advantage it would not have otherwise had over Excel in the competition for athletic talent. New York law does not allow tortious and unfair conduct of this nature to occur without consequence, and Excel accordingly seeks the relief requested herein.

## THE PARTIES

### A.      Excel Sports Management, LLC

10.      Excel is the premiere sports management and marketing agency representing professional athletes, blue-chip brands, and marquee sports-related properties and venues. Excel is based in New York City, and has offices in Los Angeles, Miami and Chicago.

11.      Excel is a limited liability company incorporated in Delaware with its principal place of business located at 1700 Broadway, New York, NY 10019. The members of Excel include citizens of New York, Connecticut and Florida.

**B.      Klutch Sports Group, LLC**

        12.     Klutch is a sports management company providing representation to professional athletes and sports-related properties.

        13.     Klutch is a limited liability company incorporated in Delaware with its principal place of business located at 9336 Civic Center Drive, Beverly Hills, CA 90210. Upon information and belief, the members of Excel include citizens of Ohio and California.

**C.      Eric Eways**

        14.     Eways was employed by Excel in its New York headquarters as its Vice President of Basketball Partnerships from on or about January 25, 2018 until his resignation on February 15, 2022. He commenced employment with Klutch thereafter in violation of his contractual and other obligations to Excel.

        15.     At all relevant times, Eways was a resident of the State of New Jersey.

**JURISDICTION AND VENUE**

        16.     Jurisdiction and venue is proper under CPLR §§ 301 and 302 because Excel's principal place of business is in New York, Eways and Klutch regularly transact and conduct business in New York and derive income from services and/or transaction in New York, and Eways and Klutch have committed tortious acts within New York.

        17.     Venue is proper in this Court pursuant to CPLR § 503 because Excel maintains its principal place of business in New York County and because a substantial part of the events giving rise to the within claims occurred in New York County.

**FACTUAL ALLEGATIONS**

**A.      Competition In The Sports Management And Marketing Industry**

        18.     Excel represents professional athletes with regard to their team contracts and

-4-

various off-court endeavors, including sponsorship deals, endorsements, and other marketing opportunities. Excel also engages in brand marketing, in which Excel assists corporate clients with sponsorship and sports marketing investments, and sports properties, in which Excel forges partnerships between corporate brands and prominent sports teams, leagues and rightsholders through initiatives like jersey sponsorship, stadium naming rights, and event entitlements.

19. Excel is consistently ranked within the top three or four sports management agencies in the world by Forbes. However, Excel has almost universally been recognized as the top sports management agency with respect to basketball talent representation. Currently, Excel boasts a roster of more than 60 NBA star players, cumulatively including 3 NBA Rookie of the Year award-recipients, 61 All-Star appearances, and 53 NBA First-Round draft picks (the "NBA Talent").

20. Klutch was founded by Rich Paul in or around 2012 on the strength of his relationship with, and representation of, NBA star Lebron James. Klutch was originally located in Cleveland Ohio, but has been headquartered in Los Angeles, California since 2019.

21. For most of its existence, Klutch focused its efforts on representation of professional basketball players, with a current roster of 16-20 NBA players. Recently, Klutch has expanded into other sports and also sought to expand its footprint beyond talent representation.

22. Excel and Klutch are direct competitors in the niche sports management and marketing industry.

**B.    The Role of Off-Court Marketing In The Sports Management And Marketing Industry**

23. Excel does not just represent its athlete clients with respect to team contracts, but also with respect to lucrative, brand-building off-court marketing opportunities. These opportunities provide significant exposure and alternative income streams and are expected by

-5-

athletes from the sports management agencies with which they contract. An agency's failure to provide such opportunities may lead to an athlete's dissatisfaction with their agency and may prompt the athlete to seek alternative representation. This is particularly true for Excel's NBA Talent, as basketball stars tend to be some of the most visible professional athletes in the world.

24.    These off-court opportunities have taken on an additional and critical new role since July 2021, when the NCAA suspended its long-standing amateurism policy prohibiting athletes profiting from their names, images, and likenesses ("NIL") and obtaining agency representation in connection therewith. Thus, off-court marketing is the sole avenue through which Excel and its competitors can capitalize on this emerging market.

25.    Excel therefore views the off-court opportunities as a critical component of the suite of services it provides to its athlete clients and works tirelessly to succeed in this regard. These off-court opportunities are vital in recruiting new athlete clients to Excel as well as ensuring that its current athlete clients are satisfied and continue to choose Excel for all of their sports management needs.

## C.    Excel's Vice President Of Basketball Operations Is Entrusted With Sourcing And Securing Off-Court Marketing Opportunities

26.    Off-court marketing opportunities are generally not sourced or negotiated by an athlete's on-court agent at Excel. Instead, the responsibility is entrusted to a highly skilled sales and marketing professional who, at Excel, is its Vice President of Basketball Partnerships.

27.    The role demands an executive that has a variety of skills and talents to be effective, particularly in relationship development. The executive has to have a large network of contacts embedded within companies that have the budget for, and interest in, utilizing professional athletes for marketing purposes. The executive must also have the skills to expand that network through direct introductions, chance meetings at entertainment events, and aggressive cold-calling based

on targeted research to develop new relationships. These relationships are the source from which most off-court opportunities flow.

28.     These relationships arm the executive with information concerning marketing campaigns, corporate purchasing trends, and corporate marketing budgets. At Excel, its Vice President of Basketball Partnerships is the repository for this information and therefore its most important asset in capitalizing on these opportunities.

29.     With the relationship in hand, the executive must be able to discern the characteristics and traits of the corporate client as well the goal of the advertising campaign to "marry" an appropriate athlete to the brand and campaign based upon their personality, passions, or other intangibles.

30.     The executive must also have a deep understanding of the market for off-court opportunities for athletes, including: (i) the market value for sports talent; (ii) the cadence of endorsement sales; (iii) how to effectively target the right brands based on their marketing campaigns or other sports they sponsor; and (iv) how to balance brand investment parameters with athlete talent deliverables for the brand.

31.     Because these opportunities are ultimately consummated by written contract, the executive must have exceptional negotiating skills and intimate familiarity with business terms, industry standards, and athlete preferences/requirements to secure the best deals for Excel's NBA Talent, including the ability to negotiate: (i) marketing rights to talent; (ii) brand category exclusivity (or non-exclusivity) protections; (iii) payment structures; and (iv) at times, equity consideration and royalty provisions. Notably, each marketing opportunity reduced to contract is covered by a confidentiality provision that shields all of the details of the deal from public disclosure.

32.     Excel's Vice President of Basketball Partnerships has the authority to structure deal parameters on most deals with input only from the NBA Talent's sports agent or marketing manager, and final approval from the NBA Talent. Excel's Vice President of Basketball Partnerships is thus its most senior position at Excel directly responsible for all off-court marketing opportunities presented to Excel's NBA Talent.

**D.     Eways Employment With Excel**

33.     In October 2017, Excel sought to recruit a new Vice President of Basketball Partnerships. This search proved challenging as experienced candidates are few and far between given the niche industry of professional athlete representation and the limited number of marketing opportunities for such athletes. There may be only 20-30 persons working in the United States in the basketball market with the expertise, seniority and professionalism Excel expects of its Vice President of Basketball Partnerships.

34.     As a result, Excel broadened its search to candidates with only general sales and marketing experience in the sports industry, which led to the discovery of Eways as a potential candidate for the role.

35.     At the time he was presented to Excel for the position, Eways had no previous experience in sourcing and negotiating off-court marketing opportunities for professional athletes. Although he had worked in marketing and sales in the sports industry and had exposure to corporate entities, Excel would be his first employment in the athlete representation industry.

36.     Excel hired Eways as its Vice President of Basketball Partnerships based in New York in or around late January 2018. Notwithstanding his lack of experience, Excel believed its infrastructure, corporate relationship network, unique marketing strategies, and willingness to train

-8-

and invest in Eways, along with his non-talent sales experience, would allow him to develop and

succeed at Excel.

**E.     Eways Employment Agreement And His Contractual Commitments To Excel**

37.     Eways executed an Employment Agreement dated January 25, 2018 as a condition

of his employment memorializing the terms and conditions of his employment.

38.     The initial term of Eways' employment was February 12, 2018 to December 31,

2019, but it was extended through December 31, 2021. Eways was paid a signing bonus, a

substantial base salary, and incentive payments based upon his participation in a Sales Incentive

Plan.

39.     Eways' Employment Agreement described his responsibilities, in relevant part, as:

[L]eading basketball talent marketing sales, generating sales across other Company
divisions, managing and training junior sales agents assigned to Employee, and any
and all other general administrative and managerial tasks as directed by the
Company.

40.     The Employment Agreement further memorialized Eways' contractual

commitments to Excel upon which his employment was conditioned. He agreed that:

[H]e owe[d] a fiduciary duty to act loyally for the Company's benefit in all matters
relating to his employment with the Company [and that he would] devote all of his
working time, attention, knowledge and skills to the Company's business
interests...

41.     Eways acknowledged his exposure to Excel's confidential information:

Employee understands that the nature of Employee's position gives the Employee
access to and knowledge of Confidential Information and placed Employee in a
position of trust and confidence with the Company. Employee understands and
acknowledges that the intellectual and/or artistic services Employee provides to the
Company are unique, special, or extraordinary because, among other things, *the
ability of Employee to establish, foster and maintain unique relationships with,
and marketing and sales strategies for the benefit of, the Company's clients.*
Employee further understands and acknowledges that the Company's ability to
reserve these for the exclusive knowledge and use of the Company is of great
competitive importance and commercial value to the company and that the

FILED: NEW YORK COUNTY CLERK 03/08/2022 08:42 AM    Case 2:24-cv-07540-ODW-E    Document 1-1    Filed 09/04/24    Page 99 of 118  Page ID #:102    INDEX NO. 651043/2022

NYSCEF DOC. NO. 2                                                                          RECEIVED NYSCEF: 03/08/2022

improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity.

42.     Further, he acknowledged that Excel:

[The] Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a client base, generating client and potential client lists, training its employees, *and improving its offerings in the talent representation and sports marketing industries*. Employee understands and acknowledges that as a result of these efforts, Company has crated, and continues to use and create, Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace. Employee further acknowledges and agrees that, during the course of Employee's employment with the company, Employee will be given access to and become acquainted with Company confidential information and trade secrets, including, without limitation, the following…business plans and strategies, contracts, contract terms, pricing policies, commission rates, pricing information, marketing recruiting and promotional strategies, client lists, contact details of clients, personnel lists, personnel data, organizational structure, compensation structure, and other similarly confidential or proprietary materials…

43.     To protect Excel's confidential information, Eways agreed he would not:

[D]uring the course of employment or at any time following the termination (voluntary or otherwise) of Employee's employment relationship with the Company, either directly or indirectly, or by action in concert with others, either for Employee's own benefit or for the benefit of any other person or …disclose, disseminate or publish any Confidential Information…in any manner without the prior written consent of the Company[.]

44.     Eways also agreed to restrictions on his ability to solicit Excel's professional athlete

clients as follows:

For a period of eight (8) months following the termination (voluntary or otherwise) of Employee's employment relationship with the Company, Employee shall not directly or indirectly, or by action in concert with others, either for Employee's own benefit or for the benefit of any other person or entity, represent as a client or provide services to, or solicit to represent as a client or provide services to….any person or entity that (i) was a client of the company within the twelve (12) month period preceding the termination of Employee's employment with the Company and with whom Employee, or other employees of the Company reporting to or working with Employee, had dealings while Employee was employed with the Company, or (ii) was a prospective client of the Company who was actively solicited by the company within the twelve (12) month period preceding the termination of Employee's employment with the Company and Employee participated in such solicitation.

-10-

45.    And finally, Eways agreed to a non-compete provision providing as follows:

> For a period of eight (8) months following the termination (voluntary or otherwise)
> of Employee's employment relationship with the Company, Employee will not
> directly or indirectly, perform services in the [United States] in the nature of
> services performed for the Company on behalf of…any Primary Competitor.

*Id.* at Ex. B, ¶ (c).

46.    "Primary Competitor" is defined to include only those agencies that Excel

determined constitute competitors positioned to unfairly compete with it through the exploitation

Excel's confidential information and relationships  One of those agencies was Klutch.

47.    The non-compete restriction was crafted to narrowly protect Excel from the specific

harms it believed Eways could inflict on its legitimate business interests by virtue of his senior

position.  Eways agreed that his actual or threatened breach(es) of his contractual obligations  to

Excel would effect irreparable harm on Excel and that Excel would be entitled to a temporary

restraining order and preliminary and permanent injunctive relief.

48.    Each of Eways' contractual commitments were designed to survive termination of

Eways' employment or the expiration of the Employment Agreement.

49.    The Employment Agreement and surviving contractual commitments are

controlled by New York law.

**F.    Excel's Investment In Training And Developing Eways To Provide Unique And
        Specialized Services**

50.    Given Eways' lack of experience, Excel devoted extensive time and resources into

his development and essentially provided him with its own playbook on off-court marketing that

provided it with success in competing with other agencies for marketing opportunities for its NBA

Talent.

51.     To begin, Excel immediately integrated Eways' into its team of NBPA-certified player agents, who represent Excel's NBA Talent with respect to team contracts, and marketing managers, who, among other things, support Excel's NBA Talent by managing their commitments under marketing deals. His immersion within Excel's basketball function was supplemented by periodic and ongoing internal and external trainings designed to convert his general sales skills into an expertise in talent sales.

52.     Excel hired additional personnel to directly support Eways in any capacity he deemed necessary.

53.     Excel invested heavily in publicizing and promoting Eways to the basketball community at large including paying for him to attend high-profile events, conferences, and key meetings, for the purpose of allowing him to develop relationships with corporate sponsors in those markets.

## G.   Eways' Exposure To Excel's Confidential Information And Relationships

### i.     Off-Court Marketing Business

54.     Excel introduced Eways to its existing brand partners that Excel knew were predisposed to allocating marketing budgets towards endorsements with professional athletes. Eways did not have any pre-existing relationships with brand partners developed for the purpose of providing professional athletes for marketing campaigns.

55.     Excel maintains a detailed electronic profile on each of these brand partners that contains, among other information: (i) all points of contact within the relationship, including personal details on each of those points of contact; (ii) all historical deals and deal terms; (iii) information about proposed marketing campaigns and the "story" a given brand partner likes to

-12-

tell through advertising; and (iv) relevant information learned by any Excel employee concerning the brand partner.

56.     Excel also paved the way for Eways to have an audience with numerous new brand partners. Eways' association with Excel provided him with a significant advantage in developing relationships as companies knew that Excel boasted a roster of some of the most marketable talent in professional basketball.

57.     The relationships Excel supported him in developing allowed him to serve as the repository of critical brand partner information, such as campaigns, budgets, and preferences, to be used strategically by Excel for its benefit and that of its NBA Talent.

58.     Excel also granted Eways access to intimate and confidential details on its NBA Talent, which allowed him to paint a portrait of how they might be pitched for marketing purposes, as well information concerning their historical deals, which allowed him to asses viable opportunities and develop negotiation strategies.

59.     Eways was also privy to Excel's most sensitive marketing strategies and initiatives as the most senior executive responsible for off-court basketball marketing. Indeed, as recently as November 2021, Eways attended Excel's annual basketball summit where Excel disclosed its strategic roadmap for the continued growth and expansion of Excel's presence in basketball.

60.     Excel's unique and specialized marketing processes, strategies, and "know-how" is perhaps its biggest competitive advantage in the industry. Many of Excel's competitors are fairly young entrants into the industry. Excel, in contrast, was founded by successful industry agents who have worked tirelessly over the last 20 years to outperform competitors by installing critical business processes and deploying novel marketing strategies. Excel's business model, and its constituent components, are a differentiator among its competitors.

61.     Excel takes reasonable measures to protect the secrecy of much of the information outlined above. These measures including maintaining IT security and infrastructure; ensuring compliance with documented security policies and protocols focused on protecting data from being accessed by unauthorized users, both inside and outside Excel; utilizing unique user IDs and strong passwords; and requiring all employees to sign confidentiality agreements, which notify employees that the disclosure of confidential information is strictly prohibited.

62.     Collectively, Excel's investments, its relationships, its stature and roster of NBA Talent, and its confidential information and unique marketing approach, armed Eways with the tools to succeed in a field with which he had limited direct experience before joining Excel and developed him into a successful and valuable asset for Excel in growing corporate relationships that translated into marketing opportunities for Excel's NBA Talent.

### ii.     NIL Business

63.     The NIL business is a new and fertile opportunity for agencies to establish relationships with student-athletes before they become professional through the provision of representation for the purposes of marketing opportunities.

64.     Excel directed Eways to assume responsibility for working with Excel's analytics division to develop a proprietary analytical tool for purposes of identifying and recruiting potential NIL athletes. Eways also developed Excel's recruiting pitches for student-athletes focused on the marketing opportunities Excel could present. In short, Eways served as a key member of Excel's leadership team in creating the blueprint for Excel's success in this highly competitive and emerging business.

### iii.    Properties Business

65.    Although Eways did not have direct responsibility for Excel's Properties business, he was regularly exposed to Excel's confidential information in this space during twice-weekly sales meetings.

66.    For example, Eways was exposed to the status of ongoing or potential projects, the identities of brand partners that expressed an interest in participating in a properties partnership, the budgets and specific types of projects such brand partners expressed an interest, and deal terms and structures, the latter of which were always memorialized with confidentiality clauses. Eways also learned of Excel's pricing structures through which it generates revenue from the sports properties it represents.

## H.    Eways' Performance And Conduct Leading Up To The Resignation Of His Employment

67.    Armed with Excel's confidential information, equipped with the training and tools bestowed on him, buttressed by Excel's NBA Talent, and capitalizing on Excel's corporate relationships, Eways performed well for the bulk of his tenure at Excel, securing millions of dollars in off-court marketing opportunities for Excel's NBA Talent.

68.    However, his performance declined in the months leading to his resignation of employment. Specifically, the value of marketing opportunities he secured for Excel's NBA Talent fell 78% from the same three-month period a year prior.

69.    In November 2021, Eways verbally agreed to a further two-year extension of his Employment Agreement through December 2023. Despite being presented with a written extension memorializing the verbal agreement, he never signed it.

-15-

70.    On February 15, 2022, Eways emailed Excel's President and Chief Business Officer to inform them of his resignation, effective immediately. That same day, Excel sent Eways a letter reminding him of his post-employment obligations to Excel.

71.    On or about February 17, Excel learned that Eways accepted employment with Klutch and, according to his LinkedIn profile, he began as its Head of Marketing as of March 2022. Upon information and belief, his duties and responsibilities with Klutch are coextensive with, or greater than, his duties and responsibilities at Excel and including oversight of off-court marketing opportunities for professional athletes.

72.    On or about February 24, Excel, through counsel, notified Klutch of Eways' post-employment obligations to Excel. On February 28, Klutch acknowledged receipt and stated that it nevertheless intended to continue Eways' employment.

## I.    Eways' And Klutch's Conduct Constitutes Unfair Competition That Unlawfully And Irreparably Harms Excel

73.    By virtue of his employment with Klutch, Eways has wrongfully violated his reasonable non-compete agreement which is narrowly tailored to protect Excel's legitimate business interests.

74.    By virtue of his employment with Klutch, Eways has wrongfully violated his duty of loyalty and fiduciary duty to Excel.

75.    By virtue of his employment with Klutch, Eways has wrongfully redirected brand partner relationships and goodwill, to which he was introduced and permitted to develop for the benefit of Excel, to Klutch, harming Excel's legitimate business interests.

76.    By virtue of his employment with Klutch, Excel's NBA Talent will lose off-court marketing opportunities, and Excel will lose resultant commissions, the number and value of which cannot be calculated, harming Excel's legitimate business interest.

-16-

77.    By virtue of his employment with Klutch, Eways has denied Excel the value of his unique and specialized services, including the brand partner relationships Excel supported him in establishing, which he developed only because of Excel's investment of time and resources in him and in which Excel as a legitimate business interest.

78.    By virtue of his employment with Klutch, Eways will wrongfully and inevitably disclose non-public and confidential information that Excel took reasonable steps to protect from the view of the public and its competitors, including but not limited to: (i) marketing plans and strategies; (ii) brand partner information, preferences, and historical deal terms; (iii) personal and confidential information concerning Excel's NBA Talent; (iv) its analytical tool and the data used to develop the same, supporting Excel's NIL business; and (v) pricing, deal terms, and brand partner information for use in Excel's Properties business, which individually or collectively, will harm Excel's legitimate business interest in keeping this information protected from competitors.

79.    Klutch tortiously interfered with Excel's contractual rights by inducing and aiding and abetting Eways to breach his Employment Agreement and/or employing and/or continuing to employ Eways despite being on notice of Eways' contractual and other post-employment obligations to Excel, contributing to the harms to Excel's legitimate business interests identified above.

80.    Klutch has also wrongfully capitalized on the investment Excel made in Eways, wrongfully taken the brand partner relationships belonging to Excel, wrongfully taken off-court marketing opportunities belonging to Excel and its NBA Talent, and wrongfully taken the confidential information entrusted to Eways, all for the purpose of unfairly competing with Excel.

-17-

## COUNT I

### BREACH OF CONTRACT
### (Against Eways)

81.    Excel incorporates by reference and realleges the allegations contained in Paragraphs 1 through 80 above as if fully set forth herein.

82.    Eways entered into a valid, binding and enforceable Employment Agreement with Excel that required him to protect and not disclose Excel's confidential information and which required him not to work for a selection of competing sports marketing agencies for a period of eight months.

83.    These restrictions survived the termination of the Employment Agreement and the termination of Eways' employment.

84.    The restrictions on Eways' ability to disclose confidential information or to accept employment with one of the identified sports marketing agencies, including Klutch, are reasonable in scope and duration, narrowly tailored to protect Excel's legitimate business interests, and due not impose an undue burdens on Eways.

85.    Excel performed all of its obligations under the Employment Agreement.

86.    Eways breached his obligations under the Employment Agreement by accepting competitive employment with Klutch in violation of the non-compete provision, and has breached or will breach his confidentiality obligations by having disclosed, or inevitably disclosing, Klutch's confidential information.

87.    Eways' breach of his contractual duties will directly and proximately cause Excel to suffer irreparable damage and injury, as outlined above, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Excel and that Excel will continue to suffer by Eways' continued acts.

-18-

88.    Excel has also incurred incidental and consequential damages that were reasonably within the anticipation of Excel and Eways when he entered into the Employment Agreement.

89.    Excel's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

## COUNT II

### BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (Against Eways)

90.    Excel incorporates by reference and realleges the allegations contained in Paragraphs 1 through 89 above as if fully set forth herein.

91.    By virtue of Eways' contractual and employment relationship with Excel, Excel reposed trust and confidence in Eways to provide services, and to refrain from acting in any manner contrary to Excel's interests.

92.    Eways undertook such trust and confidence.

93.    By reason of the foregoing, Eways owed Excel a fiduciary duty and duty of loyalty to act in good faith and in Excel's best interests. Eways owed these duties to Excel independent of any contractual obligations to the Company.

94.    Such fiduciary duty and duty of loyalty owed by Eways to Excel existed throughout his employment with Excel and survived the termination of that employment.

95.    Eways breached his fiduciary duty and duty of loyalty to Excel by engaging in the wrongful activity as described herein including, but not limited to, absconding with Excel's brand partner relationships, attending a highly sensitive sales meeting at a time when he was preparing to depart for Klutch, and joining Klutch with an intention (or a necessity) to disclose Excel's confidential business information.

Case 2:24-cv-07540-ODW E   Document 1-1   Filed 09/04/24   Page 109 of 118   Page
ID #:112

96.     Eways' actions were and are willful and malicious and without legal justification
or excuse.

97.     Eways' breach of his fiduciary duty and duty of loyalty has and will continue to
directly and proximately cause substantial damage to Excel and its business, including damage to
its reputation.

98.     Eways' breach of his fiduciary duty and duty of loyalty has and will continue to
directly and proximately cause Excel to suffer great and irreparable damage and injury, and it will
be impossible to ascertain with any degree of certainty the exact amount in money damages that
will be caused to Excel.  Excel will continue to suffer by Eways' continued acts.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Klutch)

99.     Excel incorporates by reference and realleges the allegations contained in
Paragraphs 1 through 98 above as if fully set forth herein.

100.    The Employment Agreement executed by Eways constitutes a valid and
enforceable contract and Eways' contractual commitments which survive the termination of the
Employment Agreement and his employment with Excel are reasonable in geographic and
temporal scope, narrowly tailored to protect Excel's legitimate business interests, and do not
impose an undue burden on Eways.

101.    Excel has a contractual and business expectancy that Eways would abide by the
restrictions in the Agreement.

102.    Upon information and belief, Klutch was aware of the restrictive covenants
contained in the Employment Agreement executed by Eways, and  the attendant contractual and
business expectancies between Excel and Eways.

FILED: NEW YORK COUNTY CLERK 03/08/2022 08:42 AM
NYSCEF DOC. NO. 2

Case 2:24-cv-07540-ODW-E Document 1-1 Filed 09/04/24 Page 110 of 118 Page ID #:113 INDEX NO. 651043/2022
RECEIVED NYSCEF: 03/08/2022

103. Upon information and belief, despite Klutch's awareness of Excel's contractual and business expectations, Klutch intentionally and without justification sought to interfere with those expectancies and aid and abet Eways' breach of his Employment Agreement with Excel.

104. Upon information and belief, Klutch encouraged and solicited Eways to leave Excel and join Klutch in breach of his post-employment obligations.

105. Upon information and belief, Klutch also encouraged and solicited Eways to take, disclose, and use on Klutch's behalf Excel's business relationships, trade secrets and other confidential and proprietary information.

106. Upon information and belief, Klutch's acts of tortious interference with Excel's contractual relationship with Eways is without justification and was unlawfully motivated by Klutch's desire to misappropriate Excel's business relationships, trade secrets and other confidential and proprietary information.

107. Whether Klutch knew of Eways' contractual commitments at the time it recruited him or not, Klutch has since been put on notice, has acknowledge the same, and has committed to employing Eways in breach of those contractual commitments.

108. Klutch's actions were a significant factor in causing and now perpetuating Eways' breach of his contractual commitments to Excel.

109. Klutch's acts of tortious interference with Excel's contract with Eways has and will continue to directly and proximately cause Excel to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Excel and that Excel will continue to suffer by the continued acts of Klutch.

-21-

## COUNT IV

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Klutch and Eways)

110.    Excel incorporates by reference and realleges the allegations contained in
Paragraphs 1 through 109 above as if fully set forth herein.

111.    Until the events giving rise to this action, Excel had maintained valid business
relationships, or the expectancy of business relationships, with brand partners by implementing
the strategies and business plans it developed at its own great cost and expense. Excel had the
reasonable expectation that these relationships and prospective relationships would continue and
would not be unjustifiably disrupted.

112.    Upon information and belief, Klutch induced Eways to join Klutch so Eways could
provide Klutch with Excel's business relationships, trade secrets, and confidential and proprietary
information to lure away Excel's brand partners and usurp marketing opportunities for its benefit.

113.    The provision of Excel's valuable business relationships, trade secrets, and
confidential and proprietary information to Klutch is detrimental to Excel's business because it
allows a direct competitor to improperly benefit from the time and expense invested by Excel in
the creation of such business relationships, trade secrets, and confidential and proprietary
information to create brand partner deals and relationships for its athlete clients and expand its
market share.

114.    As a result of Defendants' intentional tortious acts, Excel's brand partner
relationships and business expectancies have been and will continue to be damaged.

115.    Defendants' acts of tortious interference with Excel's prospective economic
relations will directly and proximately cause substantial damage to Excel and its business.

116.    Defendants' acts of tortious interference with Excel's prospective economic relations will directly and proximately cause Excel to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Excel and that Excel will continue to suffer by the continued acts of Defendants.

## COUNT V

## UNFAIR COMPETITION
### (Against Klutch and Eways)

117.    Excel incorporates by reference and realleges the allegations contained in Paragraphs 1 through 116 above as if fully set forth herein.

118.    During his employment with Excel, Eways had access to Excel's trade secrets and confidential and proprietary information.

119.    In addition to his regular exposure to Excel's marketing strategies and information, brand partner relationships and information, and NBA Talent information, Eways also: (i) assisted with the development of an analytical to support Excel's NIL business; (ii) had access to brand partner and pricing information used in Excel's Properties business; and (iii) attended Excel's Annual Sales and Marketing Summit in November 2021, where Excel shared its business plans and marketing strategies for the off-court marketing and NIL business.

120.    Upon information and belief, Eways' job responsibilities at Klutch are substantially similar to those he performed for Excel such that he will not be able to fulfill his responsibilities at Klutch without disclosing or using Excel's trade secrets and confidential and proprietary information. Such inevitable disclosure to Klutch further violates Eways' duty to refrain from divulging Excel's trade secrets and confidential and proprietary information.

-23-

121.    Upon information and belief, Eways and Klutch intend to and will utilize Excel's trade secrets and confidential and proprietary information to usurp Excel's marketing opportunities, to persuade Excel's NBA Talent to contract with Klutch for representation, and to anticipate Excel's business plans and strategies, replicate its services, and unfairly compete against Excel in the sports management and marketing industry. In doing so, Defendants have exploited commercial advantages belonging to Excel and have acted in bad faith.

122.    Defendants' acts of unfair competition will directly and proximately cause substantial damage to Excel and its business.

123.    Defendants' acts of unfair competition will directly and proximately cause Excel to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Excel and that Excel will continue to suffer by the continued acts of Defendants.

## COUNT VI

### INJUNCTIVE RELIEF
### (Against Klutch and Eways)

124.    Excel incorporates by reference and realleges the allegations contained in Paragraphs 1 through 123 above as if fully set forth herein.

125.    As set forth above, Eways is in breach of the Employment Agreement by virtue of accepting employment with Klutch and performing similar, if not the same, duties as his role with Excel, including sourcing and securing off-court marketing opportunities through brand partners for the benefit of Klutch, and in other particulars to be adduced through further investigation, discovery, or at trial.

126.    As a direct and proximate result of Eways' breach of contract, and Klutch's inducement of the same, Excel's business has been damaged.

127.    Because of the nature of Defendants' conduct, there is a strong likelihood that Excel will succeed on the merits of each of its claims if this case proceeds to trial.

128.    Because of the nature of Defendants' conduct and the substantial similarity between Eway's current work for Klutch and his work at Excel, Defendants' conduct irreparably harms Excel's business interests in that it creates a substantial likelihood of imminent injury to its goodwill with brand partner relationships, to business opportunities with the same, and to its business through the disclosure of its confidential information that it took reasonable steps to protect from disclosure.

129.    Immediate injunctive relief is therefore necessary to protect Excel's interests during the pendency of this action including: (i) preventing Eways from breaching, or continuing to breach, his obligations under the Employment Agreement; (ii) preventing Klutch from inducing and/or aiding and abetting Eways' breach of his Employment Agreement; (iii) preventing Klutch from using Excel's confidential information; and (iv) prohibiting Defendants from unfairly competing with Excel.

**WHEREFORE**, Excel respectfully prays the Court that:

1.    The Court enter a temporary restraining order enjoining:

(a)    Klutch from employing or otherwise engaging Eways for the full duration of the non-compete period set forth in his Employment Agreement;

(b)    Eways from violating his Employment Agreement, including, but not limited to, the confidentiality and non-compete obligations contained therein;

(c)    Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all other persons acting in concert with them:

(i)    from all misappropriation, disclosure, or use of Excel's trade secrets and confidential and proprietary information;

(ii)    from all further violation of or tortious interference with Excel's agreements with Eways and/or its prospective economic relations; and

(iii)    from engaging in any unfair competition.

2.    The Court enter a subsequent preliminary injunction enjoining Defendants from engaging in conduct in violation of the Employment Agreement and unfairly competing with Excel until such time as this case can be decided on its merits;

3.    The Court find Eways' conduct in violation of the Employment Agreement and the contractual obligations owed by him to Excel;

4.    The Court enter a judgment permanently enjoining Eways from violating the non-compete provision for eight (8) months from the date of such Order plus such additional time during which Eways was in breach of the Employment Agreement;

5.    The Court enters a Judgment enjoining Defendants from unfairly competing with Excel;

6.    The Court award damages in an amount to be determined at trial for Eways' breach of contract;

7.    The Court award damages in an amount to be determined at trial for Eways breach of his duty of loyalty and fiduciary duty;

8.    The Court award damages in an amount to be determined at trial for Klutch's tortious interference with Excel's contractual rights;

9.    The Court award damages in an amount to be determined at trial for Defendants' tortious interference with economic relations;

10.     The Court award Excel all attorneys' fees, costs and disbursements incurred by

it in this action, together with pre-judgment and post-judgment interest; and

11.     The Court award such other and further relief as the Court deems just and

proper.

ComDated:     New York, New York
              March 7, 2022

                                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

                              By:     */s/Jonathan Stoler*
                                      Jonathan Stoler
                                      Brian D. Murphy
                                      Lindsay C. Stone

                                      30 Rockefeller Plaza
                                      New York, New York 10112
                                      Telephone: (212) 653-8700
                                      Facsimile: (212) 653-8701

                                      *Attorneys for Plaintiff Excel Sports Management, LLC*

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>07/26/2024<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ C. Cervantes _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>24STCV18643 |

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Randolph M. Hammock | 49 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    David W. Slayton, Executive Officer / Clerk of Court

on 07/29/2024 _____    By C. Cervantes _____, Deputy Clerk
    (Date)

LACIV 190 (Rev 6/18)        **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.